748 N.W.2d 154 (2008)
2008 WI 38
Nic J. EICHENSEER, Plaintiff,
Brian Dougherty and Eric B. Stener on behalf of themselves and all other similarly situated persons, Plaintiffs-Appellants-Petitioners,
v.
MADISON-DANE COUNTY TAVERN LEAGUE, INC., Amy's Cafe, Inc., The Angelic Brewing Company, LLC, Brothers of Wisconsin, Inc. d/b/a Brothers, Oscar, Inc. d/b/a Buffalo Wild Wings Grill & Bar, Bull Feathers, Inc., Zapel, Inc. d/b/a City Bar, Wisconsin Ventures, Inc. d/b/a Club Amazon and The Church Key, Kollege Klub, Inc., Schooners Bar & Grill d/b/a Lava Lounge, The Church Key d/b/a Mad Dog's Pub & Pizzeria, B.A.T., Inc. d/b/a Madhatters, Orbut of State Street, Inc. d/b/a Mondays, Nitty Gritty, LLC, Paul's Club, Inc., Plaza Tavern and Grill, Inc., The Pub, Inc., The Red Shed, Inc., Spices Restaurante, Inc., State Bar & Grill, LLC, State Street Brats, Stillwaters, Inc., Vintage LLC d/b/a Vintage Spirits & Grill, Wando Ventures, Inc., The Bull Ring of Madison, Inc. d/b/a the Irish Pub and Does 1-50, Defendants-Respondents,
Secura Supreme Insurance, Intervenor.
No. 2005AP1063.
Supreme Court of Wisconsin.
Argued October 3, 2007.
Decided May 6, 2008.
*156 For plaintiffs-appellants-petitioners there were briefs by Kay Nord Hunt, Reid R. Lindquist, Brent R. Johnson, Steven E. Uhr (of counsel), and Lommen, Abdo, Cole, King & Stageberg, P.A., Minneapolis, Minn., and oral argument by Kay Nord Hunt.
For defendants-respondents there was a brief by Kevin J. O'Connor, Kendall W. Harrison, Patricia L. Wheeler, and Godfrey & Kahn, S.C., Madison, and oral argument by Kevin J. O'Connor.
An amicus curiae brief on behalf of the University of WisconsinMadison, and oral argument by Eric J. Wilson, assistant attorney general, with whom on the brief was J.B. Van Hollen, attorney general.
An amicus curiae brief was filed by Peter C. Carstensen, on behalf of the American Antitrust Institute.
An amicus curiae brief was filed by Catherine M. Rottier and Boardman, Suhr, Curry & Field LLP; Attorney Michael P. May; and Claire Silverman, on behalf of the City of Madison and the League of Municipalities.
¶ 1 DAVID T. PROSSER, J.
This is an antitrust case. The plaintiffs[1] accuse 24 taverns in the immediate *157 vicinity of the University of Wisconsin campus in Madison and the Madison-Dane County Tavern League, Inc. (collectively, the defendants) of horizontal price-fixing violations under Wis. Stat. § 133.03(1)[2] because, in response to pressure from city government to ban all drink specials after 8 p.m. in the city, the 24 taverns agreed to eliminate drink specials at their establishments on Friday and Saturday nights after 8 p.m. We review here a published decision of the court of appeals, Eichenseer v. Madison-Dane County Tavern League, Inc., 2006 WI App 226, 297 Wis.2d 495, 725 N.W.2d 274, affirming the circuit court's grant of summary judgment to the defendants.
¶ 2 In the procedural posture of this case, we do not address whether the defendants' conduct constituted violations of antitrust law. We assume antitrust violations for purposes of determining whether the defendants have immunity for their actions. The defendants contend that their conduct is immune from Wisconsin antitrust law under: (1) the so-called "implied repeal doctrine" articulated in Town of Hallie v. City of Chippewa Falls, 105 Wis.2d 533, 314 N.W.2d 321 (1982) (Hallie I); (2) the Noerr-Pennington government petitioning doctrine articulated by the United States Supreme Court;[3] and (3) the Local Government Antitrust Act (LGAA), 15 U.S.C. §§ 34-36.
¶ 3 We conclude that the defendants' challenged actions are immune from state antitrust law under the implied repeal doctrine of Hallie I. Because of this conclusion, we determine that it is not necessary to decide the validity of the defendants' second and third defenses. Accordingly, we affirm the decision of the court of appeals.

I. FACTS AND PROCEDURAL POSTURE
¶ 4 This case was filed in Dane County Circuit Court on March 24, 2004. It was assigned to Circuit Court Judge Angela B. Bartell. The parties engaged in some discovery and filed documents with the court. The defendants moved for summary judgment in December 2004, and the plaintiffs moved for summary judgment in February 2005. The effect of counter-motions for summary judgment, together with the various filings in this case, is an assertion by the parties that the facts are undisputed, that in effect the facts are stipulated, and that only issues of law are before the court.[4]
¶ 5 In this opinion, we closely follow the circuit court's written account of the undisputed background facts, with supplementation from the summary judgment record.
¶ 6 In 1999 the City of Madison (City) began to address issues of high-risk drinking. The City was concerned that alcohol issues, especially over-consumption, were increasing in the area of the University of *158 Wisconsin-Madison (University) campus, leading to more frequent conveyances of students and others to detoxification facilities in life-threatening circumstances and increased need for expensive police response services to the campus area. The City focused on how over-consumption of alcohol reduced the health, welfare, and quality of life of people in the campus area. Mayor Sue Baumann appointed a Work Group on Downtown Alcohol Issues to address these concerns. The group included representatives from the Madison-Dane County Tavern League, Inc. (Tavern League), the University, the mayor's office, the city attorney's office, and the Madison Police Department. In April 2000 the work group issued a report making suggestions related to the perceived "over-saturation" of downtown taverns, capacity violations at the taverns, and the need for greater enforcement of existing ordinances.
¶ 7 The City's concerns were shared, and to some extent inspired, by the University. On March 1, 2000, then Provost of the University John Wiley wrote a letter to local tavern keepers in which he said that "high-risk drinking is clearly the primary health risk of our students and a major threat to their academic success." Several years earlier, the University had received a grant from the Robert Wood Johnson Foundation to fund multi-year research, political action, and monitoring to try to reduce "binge" drinking in the campus area.[5] Thus, by early 2000, the University had begun to involve itself actively in the City's decisions on retail liquor licenses near the campus.
¶ 8 The University took the position that drink specialsthat is, advertised promotions offering either: (1) special high-potency drinks containing multiple shots of liquor; or (2) multiple drinks for the price of one regular drinkwere encouraging high-risk, high-volume drinking by University students.
¶ 9 The University applied pressure to the City; and the City, in turn, began to flex its regulatory muscle. It imposed special conditions on the license of a tavern called Luther's Blues, and thereafter imposed the "Luther's Blues conditions"[6] on *159 virtually all liquor licenses issued to new or relocating liquor establishments near the campus. These conditions did not limit or set alcohol prices but were designed to discourage price reduction "specials" that the City believed encouraged high-volume and dangerous drinking.
¶ 10 The "Luther's Blues conditions" were sometimes characterized as "voluntary." They were, however, required for new licensees[7] and existing licensees who relocated or attempted to make significant changes to their businesses.[8] The circuit court pinpointed two taverns in the second category, namely, Regent Street Retreat and Buck's. None of the taverns with the "Luther's Blues conditions" imposed by the City is a defendant in this suit. By contrast, the Nitty Gritty was threatened with "conditions" at the time of a planned expansion, but avoided them after intense negotiations. The Nitty Gritty is now a defendant in this suit.
¶ 11 The City committee charged with making recommendations on liquor licenses is the Alcohol License Review Committee (ALRC), which was then chaired by Madison Alder Tim Bruer. The circuit court said of the ALRC:
ALRC's recommendations regarding whether licenses should or should not be granted and the various conditions that should be attached to those licenses were so powerful that they were almost inevitably followed by the City Council. ALRC and its chairman[,] [Alder] Bruer[,] functioned as the powerful face and voice of the City's formal and informal regulation of alcohol sold in the City of Madison.
¶ 12 In the summer of 2001 the ALRC created a "Sub-Committee on Comprehensive Alcohol Issues" (subcommittee) to continue its efforts to address problems associated with high-risk drinking. The subcommittee held public hearings at *160 which University representatives, tavern owners, and the public stated their views on drink specials and other drinking issues.
¶ 13 The subcommittee's final report recommended that the ALRC seek an ordinance regulating drink specials. That report, issued on April 25, 2002, contained draft ordinance language banning all drink specials at all Madison taverns seven days per week after 8 p.m.[9] Madison taverns and the downtown business community opposed this report and the concept of a drink specials ban because the bar owners believed that the ban was overbroad and that drink specials contributed little to high-risk drinking behavior around campus. Notwithstanding this opposition, the ALRC received the subcommittee report by a unanimous vote on May 21, 2002. The report was then referred to the Common Council, which also accepted it. Once the report was received by the Council, its recommendations went back to the ALRC for the development of an ordinance for a citywide drink specials ban.
¶ 14 On July 10, 2002, the ALRC held a meeting at the University Memorial Union at which John Wiley, who had become University Chancellor, expressed his strong support for a comprehensive drink specials ban. Richard Lyshek, a campus tavern owner, and Barbara Mercer, president of the Tavern League, continued to express opposition. At the end of the meeting, ALRC Chair Bruer told Lyshek and Mercer that he believed there were sufficient votes on the Common Council to pass an ordinance banning drink specials. The circuit court later found that Alder "Bruer specifically directed Lyshek and the Tavern League to come up with a solution to the City's drink special concerns and explained that if they didn't[,] the City would take care of the issue itself." Lyshek and Mercer conferred with one another about the need to respond to the City's demands, and Lyshek offered to coordinate outreach to the bar owners in the campus area and develop a response to the pressure on the tavern owners to self-regulate drink specials.
¶ 15 Lyshek became the point person in negotiations because he was not only a tavern owner but also a member of the ALRC. He held numerous meetings with Alder Bruer and Alder Mike Verveer, who represented most of the campus area on the Common Council. Alders Bruer and Verveer also met with other interested persons to express the City's concerns and its developing policy against drink specials. Again, the circuit court found as fact that:
Despite opposition of tavern owners to any type of ban on drink specials, [Alder] Bruer told Lyshek and Barbara Mercer that the bars needed [to] come up with their own solutions to the excessive drinking problems caused by drink specials or the City would do it for them. ALRC member Lyshek believed that *161 any bar that did not take steps to address the City's concerns on drink specials would be subject to increased police scrutiny and would have difficulties with the ALRC at the time of liquor license renewal. (Emphasis added.)
¶ 16 As a result of his outreach efforts among campus bar owners, Lyshek identified a number of bar owners who were willing to announce that they would "voluntarily" discontinue drink specials on Friday and Saturday nights after 8 p.m. to head off enactment of a citywide all-week drink specials ban. Lyshek presented the idea to Alder Verveer, who agreed that it might be acceptable to the City. Lyshek also spoke directly with Alder Bruer, who reportedly liked the idea as well.
¶ 17 A press conference was organized for September 12, 2002, at which various downtown bar owners would announce that they were acceding to the City's demands. Several days prior to the press conference, Alder Bruer contacted Lyshek and asked whether any of the bars would extend the voluntary discontinuance of drink specials after 8 p.m. to Thursday nights.[10] Lyshek resisted, telling Alder Bruer that he did not think that any bars would be willing to extend their policy to Thursdays.
¶ 18 At the September 12, 2002, news conference, various tavern owners, surrounded by Alder Verveer and University representatives, publicly announced that they were "giving in" to the City's demands and would not offer drink specials on Friday and Saturday nights after 8 p.m. The tavern keepers' principal spokesman, Marsh Shapiro, a former local television personality, delivered the following prepared statement:
News Release
For release after 2:00 p.m. Thursday September 12, 2002
Good afternoon. . . .
My name is Marsh Shapiro, owner of the Nitty Gritty Restaurant and Bar, . . . With me are Dick Lyshek, owner of Bullfeathers and the [Dane] County Tavern League representative on the Alcohol License Review Committee of which he is a non-voting member, and Kelly Meuer owner of State Street Brats. . . .
We thank you all for coming. . . .
This afternoon . . . I am acting as a spokesperson representing over 35 bar owners in the campus area.
UW Chancellor Wiley and City officials have repeatedly expressed the opinion that drink specials are promoting binge drinking and are the main cause of problems that occur at bartime specifically on week-ends in the campus area.
First and foremost, we strongly disagree with that opinion, and hold to our belief that drink specials are not the cause of the late night problems. We see drink specials as a legitimate marketing strategy designed to get customers to come to our establishments. They are the same marketing and promotion techniques that are employed in every other type of business to get customers in the door.
We are a little puzzled about the mixed messages being sent by the A.L.R.C. and the City Council. We all believe in the free enterprise system, but the ALRC continues to saturate our downtown area by approving more new licensed establishments, yet now they want us to eliminate the drink specials which is a way of competing with each *162 other and with all the new establishments in order for us to stay in business. Furthermore, we want to go on record today stating that [we] do not encourage binge drinking nor do we condone it in our bars. We would like all of our patrons to drink responsibly and to know when to say when.
It is our purpose and intent to provide clean and safe environments for our patrons for the purpose of socializing and for the responsible consumption of alcoholic beverages.
With these facts in mind, and without acknowledging that drink specials are indeed causing this problem, we as a group, have agreed that we will voluntarily and immediately end all drink specials on Fridays and Saturday nights after 8 p.m. in our establishments.
Furthermore, a majority of us agree that we will do no new advertising or promoting of week-end drink specials on local radio, TV, or in the newspapers after current and existing contracts expire.
As concerned owners and businessmen, we want to be part of the solution, not part of the problem.
In trying to build bridges and mend fences with Chancellor Wiley and City officials, we feel today we are taking this first solid step toward trying to end a problem that we all agree exists.
If it is found that late night trouble in the campus area on week-ends decreases significantly or disappears, then we will be the first to admit that drink specials were a part of the problem and we will be pleased and happy that we took this action today.
However, if after a period of time it is determined that nothing has changed, and the number of police calls has stayed the same or gone up, then we can probably conclude that drink specials were not the cause of the problems, and we will all have to continue to work together to look elsewhere to satisfactorily resolve this issue.
We do not feel that pending legislation before the A.L.R.C. to ban all drink specials at all bars and restaurants in the City of Madison is necessary.
On a related topic, we do not feel that new legislation is needed regarding the banning of smoking in our bars and restaurants in the city.[[11]]
These two issues have occupied a great deal of our time in recent months, and although these are hot button items right now, we as bar and restaurant owners feel it's time for all people to start taking the responsibility for their own actions and make solid choices relating to their drinking and smoking habits.
We do not need more legislation or controls that will adversely affect our businesses.
In summary, we are responsible alcohol license holders, honorable businessmen, community leaders, taxpayers, and good citizens of Madison, and we would like both University and City officials to treat us as such.
Thank you. . . . We will be happy to answer any questions you may have. . . .
¶ 19 When the tavern owners were asked whether drink specials could be discontinued on Thursday nights, Lyshek answered that there should be one busy night of the week, Thursday, as a "control," to test whether the absence of drink specials really had any effect on problems associated with high-risk drinking.
*163 ¶ 20 The September 12, 2002, press conference was designed to signal the tavern owners' compliance with the City's regulatory demands and policies. The circuit court later found that the news conference was also "political puffery" in an effort to get maximum press exposure to make the reported group of cooperating bar owners look as large as possibleall designed to have the maximum political impact on the ALRC and the City, so that no further steps to enact a citywide drink specials ban would appear to be necessary. The Tavern League simultaneously issued a supportive press release,[12] but it specifically reserved the right of individual tavern owners to determine their own participation based on their independent business needs.[13]
¶ 21 The circuit court found that the press conference and press releases had the desired effect. At the next ALRC meeting, the committee placed its previously stated intent to draft and pursue a citywide drink specials ban ordinance on hold. Thereafter, the Common Council never debated, voted on, or passed any ordinance banning drink specials in the downtown area.
¶ 22 Throughout 2003, at approximately six-month intervals, the ALRC received detailed reports from University officials active in monitoring campus drinking issues. These reports tracked detoxification runs and the utilization of police services in the campus area. A May 2003 University press release stated that "a voluntary effort by 25 downtown Madison bars to limit weekend drink specials coincides with declines in liquor-law violations and disorderly-conduct incidents during the first six months of the program, according to new data from the University of Wisconsin-Madison's PACE [Policy, Alternatives, Community, and Education] Project."
¶ 23 On March 10, 2004, however, the University issued a press release stating that the voluntary drink specials ban "has been inconclusive and serious alcohol-related crime continues to rise." The press *164 release cited a University PACE Project study of downtown police calls that found that downtown disorderly conduct violations increased 38 percent on Friday nights and 38.4 percent on Saturday nights from August 2002 to August 2003, at a time when the voluntary drink specials ban was in place. Despite these findings, PACE continued to advocate voluntary limits on drink specials.
¶ 24 Throughout 2004, and continuing through the time frame giving rise to the present litigation, the Madison Common Council did not enact any ordinance or other regulation banning drink specials.
¶ 25 On March 24, 2004, the plaintiffs filed this antitrust class action lawsuit against the Tavern League and the 24 downtown taverns. The suit sought damages and injunctive relief pursuant to Wis. Stat. §§ 133.03 and 803.08. The complaint alleged that the defendants entered into an agreement on September 12, 2002, to "voluntarily and immediately end all drink specials on Friday and Saturday nights after 8 p.m. ... for the express purpose of increasing prices in order to reduce output (i.e., consumption)." The plaintiffs described the defendants' conduct as a "naked, per se price-fixing conspiracy." The complaint stated that damages were "anticipated to be in the tens of millions of dollars."
¶ 26 In December 2004 the defendants filed a motion for summary judgment, which was countered in February 2005 by the plaintiffs' own motion. The defendants argued that their challenged conduct was immune from Wisconsin antitrust law under any of three legal rationales: (1) the so-called "implied repeal doctrine" of Hallie I; (2) the Noerr-Pennington government petitioning doctrine; or (3) the LGAA, 15 U.S.C. §§ 34-36.
¶ 27 On April 7, 2005, the circuit court issued an order granting the defendants' motion for summary judgment, concluding that the defendants were immune from antitrust liability under both the implied repeal and Noerr-Pennington doctrines. The circuit court did not decide whether the LGAA provided additional grounds for immunity. The circuit court stated:
Call it what you will (implied repeal, home rule, state action), when a Wisconsin municipality acts out of public health and safety concerns in its regulation of alcohol sales, antitrust and anti-competitive policies are swept away by the fundamental and near-plenary nature of the governmental authority exercised. . . .
The evidence is overwhelming that the regulatory pressure on campus bar owners generated by City and [University] officials was enormous. "Luther's Blues" style conditions prohibiting drink specials had been placed on new licenses issued in the campus area. Current license holders who relocated or remodeled their premises were subjected to similar conditions, unless they could convince the ALRC that their business practices were not a part of the problem. . . . Direct demands were made to campus bar owners and to the [] Tavern League by the longtime Chair of the ALRC for a solution to the drink special concerns of the City. . . . The Chair of ALRC was directly threatening existing bar licensees that the City would enact . . . an ordinance [banning drink specials] if the bar owners did not "police themselves," "clean up their acts," and address the drink special concerns of the City. In this context, the City, by its duly authorized ALRC representative, unilaterally decided that the bar owners should voluntarily ban drink specials at least on weekends. . . . After the announcement of the voluntary limits on drink specials, the ALRC took no further action to advance a drink special *165 ban by ordinance, unequivocally showing its approval and ratification of the negotiated voluntary ban. . . . The conclusion from this scenario, is that but for the intense demands of the City through its ALRC, there would have been no voluntary ban on weekend drink specials by campus bar owners.
¶ 28 The plaintiffs appealed this summary judgment and the court of appeals affirmed, holding that the implied repeal doctrine of Hallie I immunized the defendants' actions from antitrust liability. Eichenseer, 297 Wis.2d 495, ¶¶ 16, 22-24, 725 N.W.2d 274. In doing so, the court of appeals also analyzed federal case law interpreting the federal "state action" doctrine as an instructive analogue when applying the state law implied repeal doctrine. Id., ¶¶ 19-21. The court of appeals did not address whether the Noerr-Pennington doctrine or LGAA immunized the defendants' actions from state antitrust law. Id., ¶ 25.
¶ 29 The plaintiffs petitioned this court for review, which we granted on March 15, 2007.

II. STANDARD OF REVIEW
¶ 30 This case requires us to review a grant of summary judgment to the defendants. Whether summary judgment has been properly granted is a question of law, which we review de novo, applying the same methodology as the circuit court but benefiting from the analyses of both the circuit court and the court of appeals. Butler v. Advanced Drainage Sys., Inc., 2006 WI 102, ¶ 17, 294 Wis.2d 397, 717 N.W.2d 760. The summary judgment statute provides that the judgment sought shall be rendered when there is no genuine issue as to any material fact and "the moving party is entitled to judgment as a matter of law." Wis. Stat. § 802.08(2). Whether a party's actions are immune from antitrust liability is a question of law that we review de novo.

III. ANALYSIS
¶ 31 Some of the most contentious policy battles in the history of the United States have involved government regulation of alcohol beverages. The Nation approved the Eighteenth Amendment in 1919 prohibiting the manufacture, sale, and transportation of intoxicating liquors, but it repealed that amendment in 1933 by Section of 1 of the Twenty-first Amendment.[14] Section 2 of that Amendment gave the States "virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system."[15]324 Liquor Corp. v. Duffy, 479 U.S. 335, 346, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987) (quoting Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, 445 U.S. 97, 110, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980)). Because Section 2 has been interpreted not to override other provisions of the United States Constitution, however, there is continuing tension between anticompetitive action by state authorities in the regulation of intoxicating liquor and federal antitrust law.
¶ 32 This case presents a variation on that tension: an alleged dispute between local authorities and tavern keepers, on the one hand, and Wisconsin antitrust law, on the other.
*166 ¶ 33 The applicable statute is Wis. Stat. § 133.03(1), which is based on the federal Sherman Act. 15 U.S.C. §§ 1-7. Olstad v. Microsoft Corp., 2005 WI 121, ¶ 42, 284 Wis.2d 224, 700 N.W.2d 139. In considering this statute, we acknowledge the importance of competition in our free enterprise system. The Wisconsin Legislature, in a statement of intent for our antitrust statutes, indicates that "It is the intent of the legislature to make competition the fundamental economic policy of this state[.]" Wis. Stat. § 133.01. Regulatory agencies are admonished that the public interest requires the "preservation and promotion of the maximum level of competition in any regulated industry consistent with the other public interest goals established by the legislature." Id. (emphasis added).
¶ 34 This statement of intent acknowledges that the "public interest" can pull regulators in opposite directions. The present case requires us to examine when a conflicting public interest will prevail over the "maximum level of competition."
¶ 35 We begin with a recitation of the plaintiffs' allegations of conspiracy in restraint of trade. The plaintiffs allege that the defendants entered into a "naked, per se price-fixing conspiracy" in violation of Wis. Stat. § 133.03,[16] and that their public agreement to "voluntarily and immediately end all drink specials on Friday and Saturday nights after 8 p.m. ... for the express purpose of increasing prices in order to reduce output (i.e., consumption)" establishes the factual basis for the complaint. Defendants respond, in part, that their actions are immune from antitrust liability on grounds of the "implied repeal doctrine" articulated in Hallie I and the other grounds stated in ¶¶ 2 and 26 above.
¶ 36 To resolve the issue of immunity, we presume a violation of Wis. Stat. § 133.03. Hallie I, 105 Wis.2d at 536, 314 N.W.2d 321 (assuming for purposes of appeal that the plaintiff would be able to prove facts in support of its antitrust allegations); see also 1A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 224a, at 94 (3d ed. 2006) (noting that antitrust immunity is usually decided before the substantive antitrust issue, even though many challenged government activities very likely do not violate antitrust laws) (hereinafter Antitrust Law). Although we do not address the legal merits of the plaintiffs' antitrust claim, we note that the validity of the claim is not conceded by the defendants.
¶ 37 Assuming arguendo that the defendants' actions violate Wis. Stat. § 133.03, we are asked to decide whether these actions are immune from liability and the defendants are entitled to summary judgment. The defendants assert three grounds for immunity with respect to their actions, and we address their first two defenses in this opinion.
A. Implied Repeal Doctrine[17]
¶ 38 There are explicit statutory exceptions to some of the antitrust provisions in *167 Wis. Stat. ch. 133. For instance, Wis. Stat. § 133.03(4) provides that "This section [§ 133.03] does not apply to ambulance service contracted for under ss. 59.54(1), 60.565, 61.64 and 62.133." By exceptions of this nature and exceptions contained within statutory definitions, the legislature has effectively excepted or "repealed" antitrust law with respect to certain actors and actions.
¶ 39 The "implied repeal doctrine" addresses situations in which there is no explicit statutory exception to antitrust law but it is reasonably clear that the legislature intended to allow municipalities to undertake an action that is anticompetitive. If the legislature intends to allow municipalities to undertake an action that is anticompetitive, then that action is immune from antitrust enforcement under state law.
¶ 40 The leading case in Wisconsin for the implied repeal doctrine is Hallie I, in which we held that the City of Chippewa Falls was not liable under state antitrust law for conditioning its provision of waste treatment services to an adjacent town on the acceptance of other municipal services. Hallie I, 105 Wis.2d at 542, 314 N.W.2d 321.
¶ 41 In Hallie I, the plaintiff Town of Hallie had no sewage treatment or collection facilities. Id. at 534, 314 N.W.2d 321. The defendant City of Chippewa Falls owned and maintained a sewage treatment plant with excess capacity. Id. The town proposed to construct its own treatment plant and to connect it to the city's system. Id. The city rejected this proposal and countered with an offer to tie the use of its treatment plant with the town's agreement to allow the city to provide certain municipal services such as fire and police protection. Id. When the town did not agree to the city's offer, the city passed an ordinance annexing a portion of the town. Id. The town objected to the annexation in court and also complained that the city's tie-in scheme violated Wis. Stat. § 133.03 because it prevented the town from competing for sewer collection services. Id. at 535-36, 314 N.W.2d 321.
¶ 42 On review, we held that the town's complaint failed to state a cause of action because the city's actions, pursuant to its home rule authority and statutory annexation powers, were exempt from state antitrust law. Id. at 540, 314 N.W.2d 321.
¶ 43 The Hallie I test to determine antitrust immunity for municipal actions is "whether the legislature intended to allow municipalities to undertake such actions." Id. at 539, 314 N.W.2d 321. In other words, a court must look to see if the legislature intended a conflicting statutory scheme to override state antitrust law under a given set of facts. We noted three factors to consider in making this determination: (1) an analysis of the home rule powers of cities; (2) the type of conduct undertaken by a city in a particular instance; and (3) the general statutory framework set up by the legislature in a particular field. Id.
¶ 44 Applying these factors, we first noted the broad home rule powers that some municipalities are granted pursuant to Wis. Stat. § 62.11(5) (1979-1980)[18] and Article *168 XI, Section 3 of the Wisconsin Constitution.[19] Next, we characterized the city's conduct in annexing the town's land "as a reasonable quid pro quo that a city could require before extending sewer services to the area." Hallie I, 105 Wis.2d at 540-41, 314 N.W.2d 321. Finally, we concluded that the specific statutory scheme dealing with annexation power and joint sewer systems, under Wis. Stat. §§ 66.069(2)(c) and 144.07(1m), indicated that the legislature viewed "annexation as an appropriate prerequisite to the provision of sewage service outside the limits of a city." Hallie I, 105 Wis.2d at 542, 314 N.W.2d 321. Therefore, we held that "the legislature did not intend that a city should be liable under the state antitrust law for the kinds of acts" done by the City of Chippewa Falls. Id. at 542, 314 N.W.2d 321.
¶ 45 The court revisited the issue of municipal immunity in American Medical Transport of Wisconsin, Inc. v. Curtis-Universal, Inc., 154 Wis.2d 135, 452 N.W.2d 575 (1990) (AMT). In AMT, three private ambulance service providers alleged that the City of Milwaukee adopted a citywide emergency ambulance system that violated antitrust law. Id. at 138-39, 452 N.W.2d 575. Their complaint alleged that the city divided the Milwaukee area into four sections designated as service areas and assigned primary responsibility for each area to a single ambulance company. Id. at 139, 452 N.W.2d 575. The system benefited four different ambulance companies, but it relegated three other qualified companies to providing back-up service when a primary provider was not available. Id. The city also assumed control over the dispatch of emergency service to either the Milwaukee Fire Department or a private ambulance service, and it set all fees and rates for such service. Id. at 139-40, 452 N.W.2d 575. The plaintiffs described this system as a conspiracy to restrain trade in ambulance servicea conspiracy in which the four defendant ambulance companies fully participated with the city. Id. at 140-41, 452 N.W.2d 575.
¶ 46 This court paid homage to Hallie I but appeared to tighten the requirements for municipal immunity when it concluded that neither the city's actions nor the private providers' actions were immune from state antitrust law. Id. at 153-54, 452 N.W.2d 575. The court said the question was whether the legislature had "impliedly authorized an exception from the antitrust laws in respect to certain types of conduct." Id. at 148, 452 N.W.2d 575. It said that a city's home rule powers to determine local affairs are broad but do not supersede legislative enactments of statewide concern, such as Wisconsin antitrust law. Id. at 152, 452 N.W.2d 575. To override state antitrust law, the court said, a city must look to other statutory enactmentsbeyond home rulethat create a legislative scheme that at least impliedly authorizes anticompetitive conduct by the city. Id. at 148, 452 N.W.2d 575.
*169 ¶ 47 The gist of these cases is that a municipality may pursue the familiar objectives of home rule power, but if the tactics it chooses are anticompetitive and tend to restrain trade, the municipality will usually need to rely on supplementary authority if it expects immunity for its actions. Antitrust immunity will depend upon the legislative framework in a particular field of government activity as well as the type and purpose of the actions the municipality initiates. In the absence of explicit exceptions from antitrust statutes, such as Wis. Stat. § 133.03(4), immunity for government-related anticompetitive action will require examination of all relevant circumstances.
¶ 48 Although the City is not a defendant in this case, the City's regulation of Madison taverns is at the heart of this dispute. It is undisputed that the City imposed "Luther's Blues conditions" on the following taverns by explicit action of the Common Council: Luther's Blues, Regent Street Retreat, Buck's, Hawk's, Crave, Dotty Dumpling's, Kimia Lounge, and Nam's Noodles. It is our understanding that the city-imposed conditions on these eight establishments were more stringent in curtailing drink specials than the agreement announced by other establishments on September 12, 2002. Consequently, we begin our Hallie I analysis by focusing on what the City did officially and directly.
¶ 49 The first factor to consider in the implied repeal analysis is "the home rule powers of cities."[20]Hallie I, 105 Wis.2d at 539, 314 N.W.2d 321. The City of Madison possesses the broad home rule powers outlined by Wis. Stat. § 62.11(5) and Article XI, Section 3 of the Wisconsin Constitution. This power allows the City to act for the "health, safety, and welfare of the public," and to carry out its policy goals by "license, regulation, suppression . . . and other necessary or convenient means." Wis. Stat. § 62.11(5). These powers are subject to "enactments of the legislature of state-wide concern," such as antitrust laws. See Wis. Const. art. XI, § 3; Hallie I, 105 Wis.2d at 540, 314 N.W.2d 321. However, if we were to construe the exercise of "general charter" home rule powers as constitutionally defective whenever they deal with a matter of statewide concern, we would render Wis. Stat. § 62.11(5) a nullity. Hallie I, 105 Wis.2d at 540, 314 N.W.2d 321 (citing Wisconsin's Envtl. Decade, Inc. v. DNR, 85 Wis.2d 518, 533, 271 N.W.2d 69 (1978)). Therefore, the City of Madison's home rule powers under Wis. Stat. § 62.11(5) allow it to provide for the public health, safety, and welfare by regulating alcohol using "necessary or convenient means," including the means employed here.
¶ 50 A municipality may not disregard the state's antitrust laws simply because it possesses broad home rule authority. At the same time, not every exercise of home rule authority that tends to restrain trade must pass antitrust scrutiny. The type of action may have been excepted from antitrust law explicitly, or the actionbecause it is unilateralmay not constitute a "contract, combination . . ., or conspiracy" in restraint of trade. Wis. Stat. § 133.03(1). The non-party brief of the University of Wisconsin-Madison directs our attention to Fisher v. City of Berkeley, 475 U.S. 260, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986), in which the Supreme Court said:

*170 A restraint imposed unilaterally by government does not become concerted action within the meaning of the [antitrust] statute simply because it has a coercive effect upon parties who must obey the law. The ordinary relationship between the government and those who must obey its regulatory commands whether they wish to or not is not enough to establish a conspiracy. Similarly, the mere fact that all competing [business] owners must comply with the same provisions of the Ordinance is not enough to establish a conspiracy among [the business owners].
Id. at 267, 106 S.Ct. 1045.
¶ 51 There is no dispute that the City imposed "Luther's Blues conditions" unilaterally on eight Madison taverns.
¶ 52 Next, we turn to an evaluation of the regulation of alcohol beverages in Wisconsin to ascertain the "general statutory framework set up by the legislature" in this field for purposes of the implied repeal analysis. See Hallie I, 105 Wis.2d at 539, 314 N.W.2d 321.
¶ 53 We have observed that "the states, under the broad sweep of the Twenty-first Amendment, are endowed with `something more than the normal' police power in regulating the sale of liquor in the interests of the public health, safety, morals, and general welfare." State ex rel. Grand Bazaar Liquors, Inc. v. City of Milwaukee, 105 Wis.2d 203, 217, 313 N.W.2d 805 (1982) (citing California v. LaRue, 409 U.S. 109, 114, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972)).
¶ 54 In Odelberg v. City of Kenosha, 20 Wis.2d 346, 122 N.W.2d 435 (1963), this court reiterated the justifications for the near-plenary police power that a unit of government has to regulate alcohol sales:
The justification for the exercise of the police power in restraining or prohibiting the sale of intoxicating liquors has been stated and restated by the courts time and again. It may be summed up as resting upon the fundamental principle that society has an inherent right to protect itself; that the preservation of law and order is paramount to the rights of individuals or property in manufacturing or selling intoxicating liquors; that the sobriety, health, peace, comfort, and happiness of society demand reasonable regulation, if not entire prohibition, of the liquor traffic. Unrestricted, it leads to drunkenness, poverty, lawlessness, vice, and crime of almost every description. Against this result society has the inherent right to protect itselfa right which antedates all constitutions and written lawsa right which springs out of the very foundations upon which the social organism rests; a right which needs no other justification for its existence or exercise than that it is reasonably necessary in order to promote the general welfare of the state.
Id. at 350, 122 N.W.2d 435 (quoting Zodrow v. State, 154 Wis. 551, 555, 143 N.W. 693 (1913)).[21] To serve these policy goals, the statutory scheme governing alcohol in Wisconsin is pervasive, sweeping, and restrictive.
¶ 55 Chapter 125 of the Wisconsin Statutes regulates "Alcohol Beverages." The chapter's statement of legislative intent "provides this state regulatory authority over the production, storage, distribution, transportation, sale, and consumption of alcohol beverages by and to its citizens, for *171 the benefit of the public health and welfare and this state's economic stability." Wis. Stat. § 125.01. Chapter 125 covers approximately 34 pages of the Wisconsin Statutes. This shows that the manufacture and sale of alcohol beverages is one of the most heavily regulated trades in our state. Here are some familiar examples.
¶ 56 Persons under age 21 cannot purchase alcohol. Wis. Stat. §§ 125.02(8m), (20m), and 125.07. Consequently, an underage person "not accompanied by his or her parent, guardian or spouse who has attained the legal drinking age may not enter, knowingly attempt to enter or be on any premises for which a license or permit for the retail sale of alcohol beverages has been issued," subject to certain exceptions. Wis. Stat. §§ 125.07(3)(a); 125.07(3)(a)1.-14. An underage person who procures or attempts to procure alcohol, possesses or consumes alcohol, knowingly enters or attempts to enter a licensed premises, or falsely represents his age to receive alcohol from a licensee or permittee, may be fined, required to complete community service, or temporarily lose his driver's license. Wis. Stat. §§ 125.07(4)(a); 125.07(4)(bs). Those who sell liquor to an underage person or a person of age who is intoxicated also are subject to substantial fines, or even imprisonment. Wis. Stat. §§ 125.07(1)(b)2.a.-d.; 125.07(2).
¶ 57 No person may sell alcohol without a license, Wis. Stat. § 125.04(1), and the statutes list numerous requirements to obtain such a license. See Wis. Stat. § 125.04(5). Consumption of alcohol on premises open to the public is also prohibited unless the lessee, owner, or person in charge of the operation possesses a license. Wis. Stat. § 125.09(1). Most license holders must be at least 21 years old, Wis. Stat. § 125.04(5)(a)3., and successfully complete a "responsible beverage server training course" before being granted a license. Wis. Stat. § 125.04(5)(a)5.
¶ 58 Significantly, some of the state's vast power to regulate alcohol has been delegated to municipalities. Municipal authority to regulate alcohol sales and consumption, including licensing, is outlined in several sections of Wis. Stat. ch. 125. General municipal authority to regulate alcohol is outlined in Wis. Stat. § 125.10(1):
(1) Authorization. Any municipality may enact regulations incorporating any part of this chapter and may prescribe additional regulations for the sale of alcohol beverages, not in conflict with this chapter. The municipality may prescribe forfeitures or license suspension or revocation for violations of any such regulations. Regulations providing forfeitures or license suspension or revocation must be adopted by ordinance. (Emphasis added.)
¶ 59 Licensing the sale of alcohol beverages is the exclusive province of municipalities, so long as it does not conflict with state standards.
¶ 60 Licensing is the primary tool available to municipalities to regulate alcohol sales and consumption. Most notably, any municipality may put to a vote "whether the municipality shall issue retail licenses for the sale of fermented malt beverages or intoxicating liquor[.]" Wis. Stat. § 125.05(1). In other words, municipalities have the right to ban alcohol sales within their borders. See Johnson v. Town Bd. of Wyocena, 239 Wis. 461, 465, 1 N.W.2d 796 (1942).[22] If a municipality *172 chooses to issue licenses, it "may grant and issue `Class A' and `Class B' licenses for retail sales of intoxicating liquor, and `Class C' licenses for retail sales of wine, from premises within the municipality to persons entitled to a license under this chapter as the issuing municipal governing body deems proper[.]" Wis. Stat. § 125.51(1)(a) (emphasis added).
¶ 61 Alcohol sales licenses are issued on an annual basis by the municipality; they are considered privileges rather than vested property rights. See State ex rel. Ruffalo v. Common Council of City of Kenosha, 38 Wis.2d 518, 523, 157 N.W.2d 568 (1968). Both "Class A" and "Class B" licenses may be revoked by the municipality if the terms of the license are not honored. Wis. Stat. §§ 125.25(3), 125.26(3).
¶ 62 Some "Class B" retail licenses are limited in numbera quota has been placed on their issuance by the legislature. Wis. Stat. § 125.51(4). This is anticompetitive.
¶ 63 "Class B" sellers are not permitted to remain open between the hours of 2 a.m. to 6 a.m. during weeknights and 2:30 a.m. to 6 a.m. on Saturday and Sunday nights, subject to certain exceptions. Wis. Stat. §§ 125.32(3); 125.68(4)(c). This is anticompetitive.
¶ 64 Alcohol may not be sold by "Class A" retailers after 9 p.m. and before 8 a.m. Wis. Stat. § 126.68(4)(b). This is anticompetitive.
¶ 65 The preceding analysis describes only a few of the many regulations in Wis. Stat. ch. 125. The legislature's regulatory scheme in this field does not intend or permit unbridled competition. In fact, the regulatory scheme in place is overtly anticompetitive and intentionally gives municipalities leeway to place significant barriers in the way of alcohol sales and consumption.
¶ 66 We agree with the court of appeals' conclusion that Wis. Stat. ch. 125 "contemplatesand expressly directsthat regulation is to supersede competition in the retail sale of alcohol beverages in Wisconsin." Eichenseer, 297 Wis.2d 495, ¶ 15, 725 N.W.2d 274. Unlike the statutes in AMT, the regulatory scheme in question here indicates a legislative intent to make state antitrust law "not applicable . . . by authorizing contrary or inconsistent conduct" by the City. See AMT, 154 Wis.2d at 148, 452 N.W.2d 575. Within reason, municipalities have broad statutory authority to prescribe or orchestrate anticompetitive regulation in the sale and consumption of alcohol if that regulation serves an important public interest. The statutory licensing scheme gives municipalities the power to do what the City did in this caseimpose anticompetitive "Luther's Blues conditions" on new licenses and license renewals as a means of discouraging over-consumption. See Wis. Stat. § 125.51(1)(a) ("Every municipal governing body may grant and issue `Class A' and `Class B' licenses for retail sales of intoxicating liquor . . . from premises within the municipality to persons entitled to a license under this chapter as the issuing municipal governing body deems proper").
¶ 67 This brings us to the third and final Hallie I factor, "the type of conduct undertaken by a city in a particular instance." Hallie I, 105 Wis.2d at 539, 314 *173 N.W.2d 321. The City was concerned about binge drinking by students and others at establishments near the University of Wisconsin campus. It was concerned in general because binge drinking and over-consumption were creating life-threatening conditions for some drinkers, as well as vandalism, disorder, and sexual assault affecting innocent third parties. The City was also concerned about the expensive police services it was required to provide.
¶ 68 The City believed that "Luther's Blues conditions" limiting drink specials would respond to potential binge drinking at specific licensed establishments, and it imposed those conditions on at least eight Madison taverns. The City's actions also served as warning to other taverns.
¶ 69 The City's imposition of conditions on taverns it licensed was commonplace; its imposition of "Luther's Blues conditions" on eight taverns was an official exercise of legislative judgment by the Common Council. Invalidating the City's action on antitrust grounds would severely undermine a municipality's authority to regulate the sale of alcohol beverages within its borders and represent a sea change in Wisconsin law.
¶ 70 To sum up, insofar as the City is concerned, we believe the City's action in imposing "Luther's Blues conditions" on eight tavern licensees is immune from antitrust liability under the implied repeal doctrine of Hallie I.
¶ 71 We acknowledge that the issue in this case is not whether the City is immune for its actions but whether the defendants are immune for their "voluntary" agreement to eliminate alcohol drink specials in their establishments after 8 p.m. on Friday and Saturday nights. In reality, we must determine whether private parties are eligible for antitrust immunity when they act in concert, in an anticompetitive manner, in direct response to pressure bordering on compulsion from a municipality with the power to condition or non-renew their licenses.
¶ 72 As noted above, the material facts are not in dispute. In her comprehensive, well-reasoned decision, Circuit Judge Angela Bartell found that the evidence was overwhelming that the pressure on campus bar owners from the City and University officials was "enormous." The longtime chair of the ALRC threatened that the City would enact a citywide ban on drink specials if the bar owners did not "police themselves," "clean up their acts," and devise a solution to the City's concerns. "In this context, the City, by its duly authorized ALRC representative, unilaterally decided that the bar owners should voluntarily ban drink specials at least on weekends." After the bar owners acceded to the City's demands, the ALRC took no further action to ban drink specials by ordinance, "unequivocally showing its approval and ratification of the negotiated voluntary ban." "But for" the intense demands of the City through its ALRC, there would have been no voluntary ban on weekend drink specials by campus bar owners. See ¶ 27, above.
¶ 73 The circuit court's factual findings are not clearly erroneous. On the contrary, they appear to be inescapable. The question remaining is whether private tavern keepers acquire the immunity from antitrust enforcement that a municipality would enjoy because of the City's intense involvement in these circumstances.
¶ 74 The court of appeals turned to federal precedents discussing the "state action" doctrine to help answer this question.[23]Eichenseer, 297 Wis.2d 495, ¶ 19, *174 725 N.W.2d 274. Federal precedents are often instructive and persuasive in analyzing Wisconsin antitrust law. Conley Publ'g Group Ltd. v. Journal Commc'ns, Inc., 2003 WI 119, ¶ 17, 265 Wis.2d 128, 665 N.W.2d 879; AMT, 154 Wis.2d at 152-53, 452 N.W.2d 575.
¶ 75 The federal "state action" antitrust immunity doctrine originated in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Parker established an exemption from federal antitrust law for "state action or official action directed by a state." Id. at 351, 63 S.Ct. 307. In this early decision, the Court added a caveat that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." Id. (citing Northern Sec. Co. v. United States, 193 U.S. 197, 332, 344-347, 24 S.Ct. 436, 48 L.Ed. 679 (1904)).
¶ 76 In time, however, the Court revised its position. In Southern Motor Carriers Rate Conference, Inc. v. United States, 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985), the Court stated:
Although Parker involved an action against a state official, the Court's reasoning extends to suits against private parties. The Parker decision was premised on the assumption that Congress . . . did not intend to compromise the States' ability to regulate their domestic commerce. If Parker immunity were limited to the actions of public officials, this assumed congressional purpose would be frustrated, for a State would be unable to implement programs that restrain competition among private parties. A plaintiff could frustrate any such program merely by filing suit against the regulated private parties, rather than the state officials who implement the plan. We decline to reduce Parker's holding to a formalism . . .
Id. at 56-57, 105 S.Ct. 1721 (footnote omitted).
¶ 77 Town of Hallie v. City of Eau Claire, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985) (Hallie II) was decided the same day as Southern Motor Carriers. In the course of defining when local municipalities are exempt from federal antitrust law, the Hallie II Court observed that "[w]here a private party is engaging in . . . anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State." Hallie II, 471 U.S. at 47, 105 S.Ct. 1713. To address this concern, the Court has established a two-prong test to determine whether "state action" antitrust immunity extends to the actions of private parties: "First, the challenged restraint must be `one clearly articulated and affirmatively expressed as state policy.' Second, the State must supervise actively any private anticompetitive conduct." Southern Motor Carriers, 471 U.S. at 57, 105 S.Ct. 1721 (citing Midcal, 445 U.S. at 105, 100 S.Ct. 937 and quoting City of Lafayette, La. v. Louisiana Power & Light Co., 435 U.S. 389, 410, 98 S.Ct. 1123, *175 55 L.Ed.2d 364 (1978)). This two-prong test is used to determine whether private action, closely linked to government action, should be protected from antitrust law, inasmuch as the success of an antitrust action should "depend upon the nature of the activity challenged, rather than on the identity of the defendant." See Southern Motor Carriers, 471 U.S. at 58-59, 105 S.Ct. 1721 (citations omitted).
¶ 78 The instant case does not involve "state action," and technically it does not involve municipal action. But we think it makes sense to apply the Southern Motor Carriers analysisfirst adopted in Midcal and City of Lafayetteto our third Hallie I factor ("the type of conduct undertaken by a city in a particular instance," Hallie I, 105 Wis.2d at 539, 314 N.W.2d 321) to determine whether the City's immunity extends to the defendants.
¶ 79 With regard to the "clear articulation" test, state law empowers municipalities to "prescribe additional regulations for the sale of alcohol beverages, not in conflict with [Chapter 125]." Wis. Stat. § 125.10(1). The imposition of "Luther's Blues conditions" on eight licensees is an exercise of this power. As one authority notes, "[a] state policy to displace competition can be inferred if the challenged restraint is a foreseeable consequence of the municipality's engaging in state-authorized activities, or if the statutory provision empowering the municipality's action plainly shows that the legislature contemplated the kind of action complained of." Melissa K. Stull, Annotation, What constitutes "state action" rendering public official's participation in private antitrust activity immune from application of federal antitrust laws, 109 A.L.R. Fed. 758 (1992). See also City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 372-73, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) (observing that the purpose of the zoning regulation in question was to displace unfettered business freedom in a manner that regularly had the effect of preventing normal acts of competition); Hallie II, 471 U.S. at 42, 105 S.Ct. 1713 (noting that anticompetitive effects would logically follow from statutes authorizing a city to refuse to provide sewage services to unannexed areas).
¶ 80 "Luther's Blues conditions" represented the University's goal for campus taverns. "Luther's Blues conditions" were formally received by the ALRC on May 21, 2002. The ALRC's report recommending "Luther's Blues conditions" was subsequently "accepted" by the Madison Common Council. The ALRC drafted an ordinance imposing on all taverns the conditions that the council had imposed on eight taverns, and it repeatedly threatened to push for the enactment of that ordinance. The record before us is bereft of evidence that Alder Bruer and Alder Verveer were rogue regulators acting without the approval of the Council and the Mayor. We think the "clearly articulated policy" prong has been satisfied because the defendants' agreement was a scaled-down version of the "Luther's Blues conditions," first demanded, then ratified, by the ALRC Chair.
¶ 81 With regard to the second prong of the Midcal/Southern Motor Carriers test, the Court has stated that "the active state supervision requirement should not be imposed in cases in which the actor is a municipality." Hallie II, 471 U.S. at 46, 105 S.Ct. 1713. Thus, the "basic question in antitrust cases that involve municipal and private actors is whether the municipality or the regulated party made the effective decision that resulted in the challenged anticompetitive conduct." Mich. Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 537-38 (6th Cir.2002). See also Vartan v. Harristown *176 Dev. Corp., 661 F.Supp. 596, 604 (M.D.Pa. 1987) ("The crucial question [is] which entity [is] the effective decisionmaker."), aff'd, 838 F.2d 1208 (3d Cir.1988); City Commc'ns, Inc. v. City of Detroit, 660 F.Supp. 932, 935 (E.D.Mich.1987), aff'd, 888 F.2d 1081 (1989). "Active encouragement" is also viewed as a hallmark of whether a private party was "supervised" by the municipality for purposes of antitrust immunity. See Cine 42nd St. Theater Corp. v. Nederlander Org., 790 F.2d 1032, 1048 (2d Cir.1986).
¶ 82 In this case, the City was the effective decision maker with regard to the defendants' agreement to eliminate drink specials on Friday and Saturday nights after 8 p.m. It is undisputed that the defendants entered into their agreement as a direct response to the City's increasing regulatory pressure. Without this pressure, the defendants would have had no motivation to voluntarily ban weekend drink specials after 8 p.m. As the circuit court correctly noted, the City's actions, through Alder Bruer, were the "but for" cause of the voluntary ban.
¶ 83 The plaintiffs allege that the defendants entered into an agreement to voluntarily end all drink specials on Friday and Saturday nights after 8 p.m. "for the express purpose of increasing prices in order to reduce output (i.e., consumption)." At this point, we must accept that allegation as true. However, it should be obvious that the purpose stated in the complaint is a purpose that would be sought primarily by the City and the University, not the defendants. The defendants would have understood that if drink specials were an effective way to market their taverns, they would be placing themselves at a competitive disadvantage with those Madison taverns that were not limiting weekend drink specials.[24]
¶ 84 "Active supervision" can be interpreted in a more conventional way: the degree of monitoring by the City. The 24 defendant taverns are reviewed annually for license renewal. The ordinance establishing the ALRC provides that the ALRC has the responsibility and duty to view the triennial "Alcohol License Problem Report" submitted by the Chief of Police and may conduct additional review of problems reported with the licenses affected. Eichenseer, 297 Wis.2d 495, ¶ 3 n. 4, 725 N.W.2d 274. The University submits periodic reports to the ALRC with the results of its own monitoring of the campus bar scene.
¶ 85 In short, we think the active supervision prong has been satisfied.
¶ 86 The undisputed facts suggest that the City compelled the defendants' actions through threat and coercion. The facts suggest that the City thereafter approved the defendants' actions. The facts suggest that the City is closely monitoring the defendants' actions and would not tolerate an end to those actions.
¶ 87 "[A] private party should not be induced to . . . comply with regulatory regimes at the risk that later invalidity of those . . . regimes will leave the part[y's] active compliance naked to antitrust scrutiny as if there had been no official action." Antitrust Law, supra, *177 ¶ 228d, at 222. Furthermore, "where the private defendant had no discretion but to obey the [regulation] or challenge it in court, one can rightfully say that the cause of the plaintiffs' injuries is not the defendant's act but the government's compulsion." Id. at 223. The City was the effective decision maker with regard to the alleged anticompetitive actions at issue and has actively supervised them; therefore, its immunity should extend to the defendants. See Mich. Paytel, 287 F.3d at 537-38; City Commc'ns, Inc., 660 F.Supp. at 935.
¶ 88 As we look at the "conduct undertaken . . . in a particular instance," we note that neither the City nor the defendants is directly setting the price of alcohol beverages in the campus area. The defendants may compete with each other and must compete with other taverns in the Cityon overall price. There is no effort by anyone to allocate markets or market share. There are many, many options available to consumers who respond solely to price. We are influenced in this decision by the inextricable link between the City's objectives and the defendants' actions, as well as the transparency of this link. The cause and effect relationship between the City's threats and the defendants' response to those threats sets this case apart from most cases we are likely to see.
¶ 89 Accordingly, we conclude that Hallie I should be extended to recognize that the actions of the defendants, under the intense pressure of the City, were intended by the legislature to be immune from antitrust liability when the legislature granted municipalities broad authority to regulate the sale and consumption of alcohol beverages. To conclude otherwise would enshrine theory over practical reality.
B. Noerr-Pennington Doctrine Immunity and the Local Government Antitrust Act
¶ 90 The defendants also argue that their challenged actions in persuading the City not to enact an ordinance banning drink specials seven days per week were efforts to influence public officials and therefore immune from plaintiffs' antitrust claims under the Noerr-Pennington government petitioning doctrine.
¶ 91 The Noerr-Pennington doctrine establishes a means of protecting the First Amendment rights of private parties to petition government in the face of antitrust law. In Eastern Railroad Presidents Conference v. Noerr Motor Freight, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the United States Supreme Court held that railroad operators were immune from liability for a federal antitrust claim brought by truckers because antitrust laws were never intended to interfere with the ordinary political process. Id. at 135-37, 81 S.Ct. 523. The railroads had allegedly petitioned state government officials through "a publicity campaign against the truckers designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business, to create an atmosphere of distaste for the truckers among the general public, and to impair the relationships existing between the truckers and their customers." Id. at 129, 81 S.Ct. 523. The Court held that the railroads were immune from federal antitrust law because such law "does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." Id. at 136, 81 S.Ct. 523.
¶ 92 Four years later, in United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the *178 Court reiterated its Noerr decision and held that "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of [antitrust law]." Id. at 670, 85 S.Ct. 1585.
¶ 93 Although we have never recognized the Noerr-Pennington doctrine as providing immunity to state antitrust law, we have signaled that the doctrine might apply. See AMT, 154 Wis.2d at 156, 452 N.W.2d 575 ("There may, of course, come a time that, under the facts, the state equivalent of the Noerr-Pennington doctrine may be re-asserted. . . ."). In AMT, we noted that "the basic premise of Noerr-Pennington [is] to protect the citizens' right to free speech and to petition government." Id. at 155, 452 N.W.2d 575.
¶ 94 This right to petition extends to public appeals to all departments of government, including cities and their legislative bodies. See Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) ("Certainly the right to petition extends to all departments of the Government."). The Seventh Circuit applied the Noerr-Pennington doctrine to immunize a petition to the Chicago City Council by private taxicab companies. Campbell v. City of Chicago, 823 F.2d 1182 (7th Cir.1987).
¶ 95 In Campbell, the plaintiffs sued the City of Chicago, Yellow Cab Company, and Checker Taxi Company, asserting violations of sections 1 and 2 of the Sherman Act. Id. at 1183. Their claims were premised upon the enactment of an ordinance regulating the manner of acquiring and holding taxicab licenses and creating a quota of 4,600 available licenses. Id. The ordinance arose out of the lobbying efforts of Yellow Cab and Checker Taxi. Id. The ordinance allegedly "erected a barrier to entry into the taxicab market." Id.
¶ 96 The defendants' petitioning activities were related to a litigation settlement with the City. In 1963 Yellow Cab and Checker Taxi sought damages arising from the City's alleged violation of a 1937 taxicab ordinance. Id. at 1186 (citing Campbell v. City of Chicago, 639 F.Supp. 1501, 1510 (N.D.Ill.1986)). As part of an agreement to drop the suit, Yellow Cab submitted a proposed draft ordinance. The City's Committee on Local Transportation held public hearings on the ordinance, and the full Chicago City Council eventually enacted it. Id. The ordinance became the subject of the antitrust claim at issue.
¶ 97 The Seventh Circuit held that this activity, seeking a favorable ordinance, was immunized petitioning activity under Noerr-Pennington. Id. at 1186-87. In doing so, the court also addressed the "sham" exception to the Noerr-Pennington doctrine, which bars immunity when "a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." Noerr, 365 U.S. at 144, 81 S.Ct. 523. In rejecting the plaintiffs' argument that the "sham" exception applied, the Seventh Circuit cited favorably Premier Electrical Construction Co. v. National Electrical Contractors Ass'n, 814 F.2d 358, 376 (7th Cir.1987):
If the injury is caused by persuading the government, then the antitrust laws do not apply to the squelching [of competition] (Parker v. Brown) or the persuasion (Noerr-Pennington). If the injury flows directly from the "petitioning"if the injury occurs no matter how the government responds to the request for aidthen we have an antitrust case.
*179 ¶ 98 Like the taxicab operator defendants in Campbell, the defendants in the instant case were seeking a favorable regulatory outcomehere, to avoid an ordinance banning all drink specials citywide after 8 p.m. Their petitioning was not a "sham" because the alleged anticompetitive "injury" caused by their actions (in voluntarily banning only weekend drink specials) would not have occurred had the government enacted its threatened ban on all drink specials. The City's all-week ban would have caused the anticompetitive "injury." In other words, the City would have been enacting the all-week ban ordinance of its own volition, not as a response to the defendants' requests for an ordinance aimed at harming competitors.
¶ 99 The difference between this case and the traditional Noerr-Pennington fact pattern is that the anticompetitive result here derives from self-regulation to head off government regulation, not government regulation in a direct form. Plaintiffs contend that antitrust immunity does not extend to self-regulation, irrespective of what prompted it, even when the self-regulation is less restrictive and less inclusive than proposed government regulation. They insist that the Noerr-Pennington doctrine protects advocacy, including advocacy of blatantly anticompetitive regulation, even when that advocacy actually produces anticompetitive regulation, but it does not protect action, even when that action is wholly defensive and preserves a greater measure of competition than proposed government regulation. If the plaintiffs have correctly summarized the Noerr-Pennington doctrine, they seem to have lost the spirit of it.
¶ 100 In any event, because we have concluded that the defendants' actions are immunized by the implied repeal doctrine, we need not decide this issue. We also do not reach the issue of whether the LGAA provides immunity for the defendants' actions.

IV. CONCLUSION
¶ 101 We conclude that the defendants' actions are immune from state antitrust law under the implied repeal doctrine of Hallie I. Accordingly, we affirm the decision of the court of appeals granting summary judgment to the defendants.
The decision of the court of appeals is affirmed.
¶ 102 ANN WALSH BRADLEY, J., and N. PATRICK CROOKS, J., did not participate.
¶ 103 SHIRLEY S. ABRAHAMSON, C.J., withdrew from participation.
¶ 104 LOUIS B. BUTLER, JR., J. (dissenting).
Since the beginning of our nation's history, our constitutional democracy "has been emphatically termed a government of laws, and not of men." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803). The profound importance of honoring this principle cannot be overstated. As the Supreme Court of Wisconsin, we are entrusted to preserve the rule of law in all we do, whether in our role of safeguarding against the violation of laws by others or in taking care to never ourselves go outside the boundaries of authority which have been established for the judiciary as for every branch of the government.
¶ 105 The majority has lost sight of this most fundamental principle, shunning the rule of law in favor of giving the force of law to informal threats from municipal officers, according coercive threats legal weight equal to that of democratically approved law. Although the majority acknowledges that to reach such a result, it must apply and extend law in unprecedented ways, it again shrugs off the rule of law, by refusing to be constrained by the pertinent controlling precedent.
*180 ¶ 106 The law and issues in this case are not nearly as complicated as the majority paints them. At issue is the agreement of competing taverns to engage in behavior which, it is assumed, constitutes price-fixing in violation of Wisconsin's antitrust laws. Although the tension between city officials and the defendant taverns is contextually relevant to understanding the events leading up to the defendants' actions, the majority grossly overstates the legal significance of such tension. The legal issue before us is the legality of the defendants' conduct, considered in light of any potentially applicable antitrust exemptions, not the legality of municipal officials' conduct or applicability of antitrust laws to them.[1]
¶ 107 The law is quite clear on when a private party is exempt from antitrust laws. First, we must heed the general rule that implied exemptions to antitrust laws are strongly disfavored, and exemptions are to be narrowly construed. See Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 126, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). Then, we look at the specific rule articulated in Town of Hallie v. City of Chippewa Falls, 105 Wis.2d 533, 314 N.W.2d 321 (1982)(Hallie I) governing antitrust exemptions for private parties. Hallie I clearly establishes that the test for whether private parties are exempted from antitrust laws is different from the test for whether municipalities are exempted. Hallie I, 105 Wis.2d at 538-39, 314 N.W.2d 321. In the case of private parties, exemptions apply only where the private party's conduct is supported by the legislatively stated purpose of a statute conflicting with the antitrust statute and where the private party's conduct is within the express provisions of the conflicting statute. Id. at 538, 314 N.W.2d 321. In this case, the defendants have pointed to no conflicting statute that expressly authorized their anticompetitive conduct. As such, the analysis could end at that point, with the law in this case being straightforward.
¶ 108 However, without any explanation, the majority utterly fails to even begin to apply these well-established rules of law. Rather than apply the correct private party antitrust exemption test, the majority engages in sleight-of-hand tactics which divert the focus away from what the defendants did in this case, focusing instead on what the City of Madison could have done and on the legality of what the majority describes as the City's actions. The troubling implication permeating the majority opinion is that the actual actions of the defendants are interchangeable with the threatened actions of certain municipal officials. Under the majority's analysis, it appears that any antitrust exemption for municipalities can be transferred to the defendants even in the absence of formal regulations explicitly allowing the defendants' conduct.
¶ 109 To get to this result, the majority engages in a series of analytical missteps, including: (1) misidentifying Hallie I as an "implied repeal" case, ignoring the dozens of supreme court cases in which we have clearly established the implied repeal doctrine as something quite distinct from the antitrust exemption rules applied in Hallie I; (2) applying the wrong Hallie I exemption test, without even acknowledging that Hallie I contains completely separate tests for private and for municipal actors; and (3) acknowledging that although Hallie I's exemption test for municipalities does not, on its own, create an exemption for the defendants, it could still do so by incorporating *181 elements of yet another inapplicable doctrine  the state action doctrine.
¶ 110 The manner in which the majority justifies applying the state action doctrine is particularly audacious: immediately after acknowledging that this is not a state action case, the majority claims that it is acceptable to treat this as a state action case anyway, simply because "we think it makes sense" to do so. Majority op., ¶ 78. The majority then proceeds to discuss the state action doctrine, arguing that by analogy, the doctrine somehow justifies its conclusion that Hallie I's test for municipal immunity extends antitrust immunity to the private party defendants after all.
¶ 111 At the end of the majority opinion, one is left wondering how one inapplicable doctrine can suddenly become applicable merely by reference to yet another inapplicable doctrine. One must also wonder why such novel and creative readings of the law, even if they made sense, are necessary, when there was a perfectly good, applicable test for private party antitrust immunity all along, the existence of which the majority never even acknowledges. Finally, one is struck by the complete illogic of the majority's apparent conclusion that because taverns are more highly regulated than other industries, there is some state policy of granting them greater, not less, immunity than other industries.[2]

I
¶ 112 The majority acknowledges the critical role antitrust law plays in the protection *182 of competition in our free enterprise system and that the unambiguous legislative policy underlying antitrust statutes is "to make competition the fundamental economic policy of this state." Wis. Stat. § 133.01. See majority op., ¶ 33. However, the majority then fails to abide by the well-established rule that implied exemptions to antitrust laws are disfavored and must be construed narrowly. See Union Labor Life Ins., 458 U.S. at 126, 102 S.Ct. 3002.
¶ 113 Instead, the majority employs a novel approach which creates a confusing hybrid of various doctrines and blurs the distinctions between exemption and repeal; between state and municipality; between state and private actor; between coercion and regulation; between actual past regulations and potential future regulations; and, ultimately, between adhering to the rule of law and rationalizing a series of legally indefensible positions by compounding and obfuscating each misapplication with another dizzying misapplication of the law until one seeking to discern a single applicable rule of law in the majority opinion is left to only wonder, upon getting to the end of the opinion, what just happened. Rather than addressing each such distortion made by the majority, I will focus on the two primary misapplications of the law and facts which appear to be the foundation of the majority opinion: the majority's "so-called `implied repeal'"[3] analysis, and its state action doctrine analysis.

A
¶ 114 In its "implied repeal" analysis, the majority describes Hallie I as the "leading case in Wisconsin for the implied repeal doctrine," and a case which allows a general statutory "scheme" or even mere "intense pressure" from a municipality to repeal and override a state antitrust law. Majority op., ¶¶ 40, 43, 89. It is profoundly puzzling how the majority could describe Hallie I in such terms, when the case never once uses the phrase "implied repeal" or describes a statutory scheme or municipal pressure "repealing" or "overriding" a specific antitrust statute.
¶ 115 This is no small semantic quibble: Hallie I does not use the phrase "implied repeal" because it is not an implied repeal case. "Implied repeal" is a highly disfavored concept in our state, and is completely distinct from the antitrust exemption tests described in Hallie I.
¶ 116 "Repeal" has a distinct meaning, long recognized by this court as meaning:
"The abrogation or annulling of a previously existing law by the enactment of a subsequent statute which declares that the former law shall be revoked and abrogated, (which is called `express' repeal), or which contains provisions so contrary to or irreconcilable with those of the earlier law that only one of the two statutes can stand in force, (called 'implied' repeal)."
Heider v. City of Wauwatosa, 37 Wis.2d 466, 478, 155 N.W.2d 17 (1967) (quoting Black's Law Dictionary (4th ed. 1951) (emphasis added)); State v. Dairyland Power Coop., 52 Wis.2d 45, 51, 187 N.W.2d 878 (1971). Furthermore, nothing in Hallie I contravenes the well-established rule of law that it is the role of the legislature to repeal statutes; where the legislature intends to repeal a law, it should do so expressly. See Seider v. O'Connell, 2000 WI 76, ¶ 80, 236 Wis.2d 211, 612 N.W.2d 659. Consequently, this court has consistently *183 rejected the application of "implied repeal" in a number of past cases, using it only in the rarest of circumstances, as a last resort, when conflicting statutes cannot be reconciled.
¶ 117 In Ward v. Smith, 166 Wis. 342, 344, 165 N.W. 299 (1917), this court explained that even where a latter statute might appear to be in conflict with an earlier statute, "it must not be supposed that the legislature intended, by the later statute, to repeal the prior one, unless the last statute is so broad in its terms and so clear and explicit in its words as to show that it was intended to cover the whole subject and therefore displace the prior statute." Since that 1917 decision, this court has consistently treated the concept of "implied repeal" with great disfavor, refusing to apply it in a variety of contexts unless an irreconcilable conflict between statutes was demonstrated to be so repugnant as to require one of them to be implicitly repealed.
¶ 118 In a 1941 decision, this court explained that "[t]he law does not favor a repeal of an older statute by a later one by mere implication," and that when such a conflict between statutes exists, "it is the duty of the court to construe the acts if possible that both shall be operative." McLoughlin v. Malnar, 237 Wis. 492, 496-97, 297 N.W. 370 (1941). Similarly, in a 1971 decision, this court quoted with approval a Black's Law Dictionary definition of implied repeal as existing where there are "`provisions so contrary to or irreconcilable with those of the earlier law that only one of the two statutes can stand in force,'" and this court concluded that "[t]he `irreconcilability' referred to in the above quote is not lightly or quickly found by this court. This is because the cardinal principle of statutory construction is to save and not to destroy. Moreover, repeal by implication is not a favored concept in the law." Dairyland Power Coop., 52 Wis.2d at 51, 187 N.W.2d 878 (citations omitted). This decision was in accord with dozens of other cases in which we have consistently used similar language describing the strong presumption against implied repeal, which can only occur where two utterly repugnant conflicting statutes cannot be reconciled.[4]
*184 ¶ 119 Unlike these actual implied repeal cases, it is clear that Hallie I does not speak in such terms or employ an implied repeal framework. Were Hallie I an implied repeal case, it would have mentioned "implied repeal" by name, and it would have applied the traditional presumption against implied repeal, a presumption which was been reaffirmed in case after case deeming implied repeal inapplicable in the absence of specific statutes so in conflict with and repugnant to each other that they cannot be reconciled.
¶ 120 Rather, Hallie I speaks in terms of antitrust exemptions, never once describing the antitrust laws at issue in that case as "impliedly repealed" or "overridden." This distinction is critical, and the majority misses it completely by labeling Hallie I as an "implied repeal" case.
¶ 121 On some level the majority appears to recognize that Hallie I is not an implied repeal case. See majority op., ¶¶ 2, 26 (describing the "so-called `implied repeal doctrine' of Hallie I"); majority op., subheading A n. 17 (seeming to explain that it is merely because the court of appeals and parties describe Hallie I as an "implied repeal" case that "[w]e also adopt this label"). This makes it even all the more puzzling why the majority is determined to designate Hallie I an implied repeal case.
¶ 122 It does not even serve the majority's ends to follow the steps of the parties and lower courts in this case which have mistakenly identified Hallie I as an implied repeal case rather than treating it as the antitrust exemption case it is. Even if the majority could point to a specific statute which conflicts with antitrust laws in such a repugnant and irreconcilable manner as to bring that statute within the parameters of the implied repeal doctrine, it could not reach the result it wants. Not only has the majority failed to identify two irreconcilable statutes which are repugnant to one another, enabling implied repeal, but it is well-established that when such a conflict between statutes addressing the same subject matter does exist, as between a more specific and more general statute, the more specific statute prevails. See Union Cemetery v. City of Milwaukee, 13 Wis.2d 64, 71, 108 N.W.2d 180 (1961); Estate of Miller v. Naze, 261 Wis. 534, 536, 53 N.W.2d 172 (1952). In this case, the antitrust statute, Wis. Stat. § 133.03(1), is more specific in addressing the anticompetitive behavior of the defendants than any of the statutes mentioned by the defendants, which describe general police powers or address alcohol in various ways but not in the specific context at issue here. See infra, ¶ 27.
¶ 123 Regardless of the majority's intent in labeling this an "implied repeal" case, one thing seems clear: the majority's failure to read our state's extensive implied repeal precedent as requiring that statutes be directly and irreconcilably in conflict before the implied repeal doctrine applies. The majority's transformation of the phrase "implied repeal" into something more vague, amorphous, and undefined gives me pause. It makes me wonder if I could just end my dissent with a similarly conclusory statement that because my description of the law conflicts with the majority's, then my later statement of the law "impliedly repeals" the majority's earlier statement, with the majority opinion effectively overridden the moment tension is created by my dissent. After all, under *185 the majority's approach, it appears that there need not be two statutes directly and irreconcilably in conflict with each other for "implied repeal" to occur, a century of precedent to the contrary notwithstanding.
¶ 124 But surely this is not what the majority means. And so I proceed with the remainder of my dissent.

B
¶ 125 Describing Hallie I as an implied repeal case rather than recognizing its true nature as an antitrust exemption case is not the majority's only mischaracterization of Hallie I. The majority's creative reading of Hallie I, even more critically, fails to acknowledge the explicit and emphatic distinction Hallie I makes between private parties and municipalities.
¶ 126 While the majority seems to conclude that Hallie I sets forth rules which are as applicable to private parties as to municipalities, Hallie I actually does the opposite. This court was careful in Hallie I to expressly differentiate between the "legislative intent" test which applies to municipalities and the more stringent "legislative intent plus express authorization" test which applies to private parties.[5] The pertinent passage of Hallie I, which the majority only selectively, and inaccurately, quotes, clearly sets forth the difference between the two tests:
This court has dealt with conflicts between the state antitrust law and other state statutes in Reese v. Associated Hospital Service, 45 Wis.2d 526, 173 N.W.2d 661 (1970), and in Grams v. Boss, 97 Wis.2d 332, 294 N.W.2d 473 (1980). These cases established the rule that an entity cannot be exempted from the state antitrust statute unless the conduct of the entity is within the express provisions of the conflicting statute and then only if its conduct is in furtherance of the conflicting statute's legislatively stated purpose. Reese at 532-33, 173 N.W.2d 661, and Grams at 342, 294 N.W.2d 473. We reiterate this rule for private entities, but we believe this rule may be overly restrictive if applied to municipalities. When dealing with actions by municipalities, we hold that the test as to the applicability of the state antitrust law is whether the legislature intended to allow municipalities to undertake such actions.
Hallie I, 105 Wis.2d at 538-39, 314 N.W.2d 321 (emphasis added). The unambiguous language of this passage clearly explains that different rules apply depending on whether the anticompetitive conduct is by private entities or by municipalities.
¶ 127 However, this distinction is lost on the majority. The majority inexplicably cites only the end of the quote describing the municipal exemption ("legislative intent") test, which the majority then misrepresents as the applicable exemption test in this case. See majority op., ¶¶ 43-48. In so doing, the majority ignores the clear language of the same Hallie I passage which explicitly describes a separate and more stringent test for private actors (i.e., a "legislative intent plus express authorization" test exempting only a private party which establishes that its conduct was "within the express provisions of [a] conflicting statute and then only if its conduct *186 is in furtherance of the conflicting statute's legislatively stated purpose." Hallie I, 105 Wis.2d at 538, 314 N.W.2d 321 (emphasis added)). It is hard to fathom how the majority could have missed the sentences that immediately precede the one it selectively quoted, not noticing that this passage of Hallie I explicitly describes the private party antitrust exemption test as distinct from and more stringent than the municipal exemption test.
¶ 128 While never acknowledging that it quoted the wrong Hallie I test or that a separate test for private parties even exists, the majority does concede in a later passage that the issue in this case is not about whether the City is granted antitrust immunity, but is about whether the defendants, as private parties, are exempt from antitrust immunity under Hallie I. Majority op., ¶¶ 70-71. However, rather than apply the correct exemption test for private parties, the majority instead appears to create a new compulsion-based test, seemingly concluding that under Hallie I, an exemption could apply if private actors demonstrate that their anticompetitive conduct was in direct response to municipal "pressure bordering on compulsion." Majority op., ¶ 71. The majority never explains (1) how its various articulations of the Hallie I test relate to each other; (2) why any of these tests should be considered an "implied repeal" test; or (3) why it does not even mention the test Hallie I sets forth for evaluating whether private parties, as opposed to municipalities, are exempt from antitrust laws.

C
¶ 129 Because the majority never applied the correct private party antitrust exemption test in the first place, its ensuing analysis which is based on the inapplicable municipal antitrust exemption test is also necessarily wrong as a result. However, even if the majority had been correct in applying the municipal instead of the private party exemption test under Hallie I, its application of Hallie I is flawed in additional respects.
¶ 130 First, the majority has failed to identify the requisite conflict between statutes required under either Hallie I or the actual implied repeal doctrine. For all its general references to statutes allowing municipalities to enact alcohol regulations and to protect public health and safety, the majority has not identified a single statute which is in conflict with state antitrust prohibitions of price-fixing by private parties such as the defendants, or which contains a legislative purpose specifically thwarted by such antitrust restrictions on price-fixing by private businesses. The majority frequently invokes ch. 125 and the statutes contained therein, but there is no direct conflict between any statute within ch. 125 and Wis. Stat. § 133.03 price-fixing prohibitions that would bring this case within the reach of Hallie I. Although various provisions of ch. 125 relate to alcohol, none address voluntary agreements by taverns to set prices in an anticompetitive manner or otherwise conflict with the text of § 133.03 prohibiting individual businesses from contracting, combining or conspiring in restraint of trade or attempting to monopolize any part of trade or commerce. The one statute highlighted by the defendants at oral argument and emphasized as well by the majority, Wis. Stat. § 125.10(1), only serves to underscore the fact that regulation of alcohol by the City requires formalization through statutorily established democratic procedures.[6] None of the other *187 provisions of ch. 125 cited by the defendants contains any language authorizing the violation of § 133.03 through creation of unlawful monopolies or "contract, combination . . . or conspiracy" in restraint of trade. To the contrary, each cited provision only serves to illustrate this state's general policy of favoring comparatively greater regulation of taverns, not greater immunity from statutes and other legal regulations.
¶ 131 Second, the majority's description of "municipal action bordering on compulsion" has no bearing on a proper antitrust exemption analysis. After conceding that the issue in this case is the immunity of the defendants, not the City, the majority immediately backpedals from this concession, adding that "[i]n reality, we must determine whether private parties are eligible for antitrust immunity when they act in concert,[[7]] in an anticompetitive manner, in direct response to pressure bordering on compulsion from a municipality with the power to condition or non-renew their licenses." Majority op., ¶ 71. The majority's description of the "reality" of this case in such terms not only deviates from the applicable Hallie I test but also requires the acceptance of a debatable premise: that there was direct pressure from a municipality in this case which bordered on compulsion.
¶ 132 Even the tavern owners' press release emphasizes that their decision to end drink specials on weekends was voluntary; the press release bolded and underlined the word "voluntarily" in the below passage:
We are a little puzzled about the mixed messages being sent by the A.L.R.C. and the city council. We all believe in the free enterprise system, but the A.L.R.C. continues to saturate our downtown area by approving more new licensed establishments, yet now they want us to eliminate the drink specials which is a way of competing with each other and with all the new establishments in order for us to stay in business.
. . . .
With these facts in mind, and without acknowledging that drink specials are indeed causing this problem, we as a group, have agreed that we will voluntarily and immediately end all drink specials on Friday and Saturday nights after 8 p.m. in our establishments [and advertising of such specials].
. . . .
As concerned owners and businessmen, we want to be part of the solution, not part of the problem.
In trying to build bridges and mend fences with Chancellor Wiley and City officials, we feel today we are taking the first solid step toward trying to end a problem that we all agree exists.
. . . .

*188 We do not feel that pending legislation before the A.L.R.C. to ban all drink specials at all bars and restaurants in the City of Madison is necessary.
. . . .
We do not need more legislation or controls that will adversely affect our businesses.
(Emphasis in original.)
¶ 133 Not only does this undisputed and clear language from the press release indicate that the taverns' decision to limit their drink specials was voluntary, the pressure it describes leading up to their decision is not described in terms of either borderline compulsion or actual regulation. Rather, the press release describes receiving mixed messages, not coercion, from two different government bodies. The press release also describes the taverns as wanting to be a part of the solution, and to end a problem they agreed existed. Further, the press release makes it clear that any regulatory pressure felt was merely the pressure of potential legislation being considered that would ban all drink specials, not any formal regulation that had already been democratically approved and promulgated.
¶ 134 Even more striking is the warning in the Tavern League's simultaneously issued press release that "while an attempt will be made to eliminate weekend drink specials, we are all independent businesses and economic pressures may prevent some from participating in this experiment" (emphasis added). This passage of the press release reveals that the taverns felt free to choose whether or not to participate in the agreement to limit drink specials, and that the more compelling pressure some of the taverns felt was the economic pressure not to engage in the drink specials limitations. As such, any pressure from the City was neither binding on all the taverns, nor, by the taverns' own undisputed words, did it necessarily outweigh economic pressures on the taverns to continue with their drink specials.
¶ 135 To support its own description of "borderline compulsion" put on the defendants, the majority relies extensively on the circuit court's description of enormous pressure placed on defendants by certain city and university officials. However, we owe no deference to the court's legal conclusion that such pressure was regulatory in nature for purposes of creating an antitrust exemption. Informal coercion by politicians does not have the same force of law as democratically promulgated regulations. By concluding otherwise, the circuit court and the majority effectively condone and add legitimacy to coercive tactics by individual municipal officials by elevating such tactics to the level of binding democratically enacted statutes, such as those creating antitrust exemptions.[8]
¶ 136 As an alternative means of characterizing the defendants' conduct as mere compliance with binding regulatory action, the majority mischaracterizes and exaggerates the role of the "Luther's Blues conditions" in this case, inappropriately describing them as a "regulation . . . at the heart of this dispute." Majority op., ¶ 48. This description is extremely misleading. As a preliminary matter, a regulation, whether past, present, or future, does not by itself create an antitrust exemption absent the elements of Hallie I's private party antitrust exemption test being met. *189 Additionally, the threatened drink specials ban which was the admitted motivating force behind the defendants' voluntary agreement is distinct from the previous "Luther's Blues conditions," which predated the key events in this case and did not even apply to the defendant-taverns which were existing or non-renewing bars. In contrast, the regulation that City officials threatened to apply to the defendant-taverns in this case was never democratically approved by vote or formally promulgated into an actual regulation as defined by Wis. Stat. § 125.02(17)(defining "regulation" as "any rule or ordinance adopted by a municipal governing body").
¶ 137 To allow coercive tactics of individual aldermen, even coupled with the threat of potential future regulation, to rise to the level of democratically approved regulatory action is to strip from this country the fundamental protections that distinguish us from a tyrannical system of government. Ours is a country of laws, not of men. It is anathema to our constitutional democracy to allow coercive behavior by individuals claiming to be acting on behalf of a city, state, or even higher, to dictate what the law is without going through a democratic legislative process to formally enact such laws. If the rule of law means anything, mere threats, no matter how enormous the pressure that accompanies them, cannot be given equal legal weight to democratically promulgated regulations.
¶ 138 Finally, even if the City had enacted a regulation that was expressly authorized by statute (satisfying Hallie I's express authorization requirement) and that not only limited drink specials but also authorized the defendants to engage in price-fixing schemes among themselves in a manner that conflicted with antitrust laws, it is not a given that such regulation would have effectively exempted the defendants from the antitrust laws.
¶ 139 In an opinion authored by Judge Easterbrook, the Seventh Circuit Court of Appeals has explained that even the existence of conflicting statutes does not, by itself, automatically result in exemption. Addressing a scenario analogous to that in this case, the Seventh Circuit held that agreements among business rivals to fix prices are not exempt from antitrust prosecution by virtue of special interest laws enacted to allow such price fixing. Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n, 961 F.2d 667, 671-72 (7th Cir.1992). The court explained that "[r]ecognition that special interest legislation enshrines results rather than principles is why courts read exceptions to the antitrust laws narrowly, with beady eyes and green eyeshades." Id. (citing Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 231, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979); Nat'l Broiler Mktg. Ass'n v. United States, 436 U.S. 816, 827-29, 98 S.Ct. 2122, 56 L.Ed.2d 728 (1978)). Consequently, even if there had been such legislation or formal regulation authorizing the defendants' conduct in this case, it would be debatable whether they were automatically entitled to an antitrust exemption.
¶ 140 Rejecting the "beady eyes and green eyeshades" approach as unflattering to its objectives, however, the majority refuses to follow the well-established rule of law that exemptions to antitrust laws must be construed narrowly and given out sparsely. The majority neither applies this correct standard of review, nor applies the correct test established by Hallie I for private party antitrust immunity.

D
¶ 141 The next inexplicable move the majority makes is to merge its Hallie I analysis with an application of yet another doctrine which does not generally apply to private actors: the "state action" doctrine. *190 Majority op., ¶¶ 74-89. While conceding that the conceptual underpinnings of the federal "state action" doctrine are distinct from what it designates as the "implied repeal" doctrine, the majority nonetheless concludes that state action cases are "instructive and persuasive." Id., ¶ 74 & n. 23.
¶ 142 In an even more astounding concession, the majority admits, just before applying the state action doctrine, that this is not "technically" a state or municipal action case. Majority op., ¶ 78. So how does the majority justify treating private actors the same as government actors for purposes of granting them some kind of "state action" immunity which morphs into a Hallie I exemption? It simply follows the concession that this is not a state action case with the conclusory statement, "But we think it makes sense to apply the [state action] analysis . . . to determine whether the City's immunity extends to the defendants." Majority op., ¶ 78 (emphasis added).
¶ 143 We think it makes sense? We think it makes sense? Surely this cannot stand as justifiable grounds or authority for extending a legal doctrine in directions never before taken by this court, in lieu of applying the applicable test explicitly affirmed in Hallie I for determining the existence of private actor antitrust immunity.
¶ 144 Even in Hallie I, this court realized that it does not make sense to apply the state action doctrine in cases not involving a conflict between two different sovereigns  the federal government and the sovereign states  which implicates the limits on federal power under the United States Constitution. Hallie Il 105`Wis.2d at 537-38, 314 N.W.2d 321. In Hallie I, this court concluded that state action principles were not present in that case involving tensions between states and municipalities because "[t]he relationship between the federal government and the states is not parallel to the relationship between the state government and the cities. Cities are creatures of the state, derive their power from it, and are not recognized as independent sovereigns." Id.
¶ 145 It makes even less sense to apply the state action doctrine in this case. Regardless of whether one accepts the majority's descriptions of the tension in this case as between the defendants and the City or as between the City and some broad statutory scheme, neither such tension brings this case within the purview of the state action doctrine as explained in Hallie I, i.e., a conflict between two sovereigns. Id.
¶ 146 The purpose of the state action test is to determine "whether state regulation of private parties is shielded from the federal antitrust laws." Southern Motor Carriers Rate Conference, Inc. v. United States, 471 U.S. 48, 57, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985) (emphasis added). The majority acknowledges that the first prong of the state action test, as described by Southern Motor Carriers, 471 U.S. at 57, 105 S.Ct. 1721, requires those seeking to extend state action antitrust immunity to private parties to show that the challenged anticompetitive conduct is conduct which is "clearly articulated and affirmatively expressed as state policy." See majority op., ¶ 77. However, the majority then fails to explain how the defendants' voluntary agreement to limit drink specials reflects "clearly articulated and affirmatively expressed" state policy. The only argument the majority makes is that "[w]ith regard to the `clear articulation' test, state law empowers municipalities to `prescribe additional regulations for the sale of alcohol beverages, not in conflict with [Chapter 125]'" and that "[t]he imposition of `Luther's Blues conditions' on eight licensees *191 is an exercise of this power." Majority op., ¶ 79.
¶ 147 This argument, like the others, makes no sense. The cases cited by the majority unambiguously provide that the state action doctrine is inapplicable absent clearly articulated and affirmatively expressed state policy allowing the restraint at issue. In this case, the challenged restraint is the defendants' conduct, which consisted of privately owned taverns voluntarily entering into a price-fixing agreement with each other. The majority has completely failed to point to a single statute which clearly articulates and affirmatively expresses state policy allowing private taverns to enter into price-fixing agreements with each other. The majority points only to the City's statutory authority to enact certain regulations, begging the question of whether the defendants have the right to engage in illegal price-fixing without regulation or statute expressly authorizing them to do so. By pointing to the "Luther's Blues conditions," which are not at issue in this case and did not require the steps the defendants took in this case, the majority once again attempts to reach a desired result through obfuscation, rather than accomplish the impossible: find a regulation, statute, or any other law which expressly authorizes private taverns to engage in price-fixing.[9]
¶ 148 In the end, it does not make sense to equate private tavern owners with state actors or with the municipalities that have the authority to regulate the taverns. It is neither good law nor good public policy to conclude that because taverns are more heavily regulated than other businesses, they should therefore be more exempt from the law.

II
¶ 149 Rather than apply well-established rules of law applicable to this case, the majority plays a creative game of hide-the-ball which attempts to fuse principles of various doctrines, none of which is directly applicable to this case, to concoct a hybrid under which all the doctrines combined magically create immunity for private parties after all. As creative as it is, the majority opinion is simply unsupported by legal authority.
¶ 150 While the majority does not have the law on its side, it does have some sympathetic policy concerns. Although preserving a competitive free market is central to our capitalist society, the policy concerns related to alcohol abuse raised by the majority are also serious. However, "[i]t is nevertheless well settled that good motives will not validate an otherwise anticompetitive practice." NCAA v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85, 101 n. 23, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984).
¶ 151 Remedying such policy problems is a legislative, not judicial function. To that end, there is already, as the majority has pointed out, an abundance of legislation regulating alcohol, and the City certainly has the authority to enact further regulatory reform through ordinances and regulations enacted through the correct democratically established processes. Furthermore, our legislature has already enacted laws prohibiting taverns from serving alcohol to intoxicated persons and to underage university students. See, e.g., Wis. Stat. § 125.07.
¶ 152 I applaud the defendants for wanting to take further affirmative steps to reduce excessive alcohol consumption. *192 However, instead of engaging in price-fixing without express statutory authorization, a better way for taverns to address alcohol abuse problems would be to work toward full compliance with laws already on the books prohibiting taverns from selling alcohol to intoxicated persons and to underage drinkers. If limitations on drink specials are a necessary step in reducing binge drinking, the parties do not appear to dispute that the City has the ability to formally promulgate a regulation limiting drink specials, and indeed has done so in the past, as evidenced by the majority's frequent references to the "Luther's Blues conditions." If the City could set such conditions before, it can do so again. Nor do antitrust laws prevent any individual tavern from choosing to end its own drink specials on its own terms, so long as such a decision is not an agreement made collaboratively with other taverns in violation of price-fixing laws. In sum, if the overriding policy concern in this case is truly the reduction of excessive alcohol consumption, solving that problem does not require the defendants to engage in collaborative price-fixing in violation of antitrust laws.
¶ 153 For all the doctrines and cases mentioned by the majority, and for all its concessions that no single doctrine, standing on its own, creates an antitrust exemption for the petitioners, it remains unclear how, whether, or to what extent the majority means to change the course of antitrust law in Wisconsin. This is the first time this court has embraced a result allowing private parties to engage in antitrust violations without express statutory authorization.
¶ 154 This court has a solemn obligation to adhere to precedent and to the rule of law. We must be cautious before creating new doctrines, particularly in the face of contrary precedent and authority. To engage in such a broad extension and unprecedented deviation from basic state action doctrine, antitrust exemption, and implied repeal principles, misapplying elements of each of these doctrines to create a new hybrid form of antitrust immunity for private actors, requires a bit more than merely shrugging off the rule of law with the empty statement that we just "think it makes sense."
¶ 155 What does make sense is the body of law preceding this decision which in no unclear terms sets forth different standards for the treatment of private and government actors under antitrust laws. What does make sense is that the state action exemption applies to state actors, not private actors. What does makes sense is the language in the very case relied upon throughout the majority opinion, Hallie I, which clearly states the test for extending antitrust immunity to private actors, a test that the majority never even attempts to apply. Rather, the majority rejects applicable precedent and long-standing principles as mere technicalities that get in the way of its result, proclaiming that even if a case does not "technically" involve municipal action, for example, that should not stop an opinion from being framed nearly entirely in terms of such municipal action. See majority op., ¶ 78.
¶ 156 The majority ultimately holds that because of its state action analysis, Hallie I should be extended to grant private parties antitrust immunity vis-à-vis a municipality exemption. This final conclusion blurs the clear distinction this court was careful to make in Hallie I between the two types of exemptions, as well as blurring the distinction between the state action doctrine and the narrow private party exemption test set forth in Hallie I. Most troubling is the majority's final swipe, adding insult to the injury it inflicts on the rule of law, as it follows its holding with *193 the bold proclamation, "[t]o conclude otherwise would enshrine theory over practical reality." Majority op., ¶ 89. This rejection of the rule of law as mere technicality and theory does a grave injustice to our legal system.
¶ 157 While limiting binge drinking may be a sympathetic policy goal, the most critical policy goal worthy of this court's affirmative protection  the rule of law itself  should never be sacrificed for the expedient achievement of any particular policy-driven end. Consequently, the majority decision should not be read as itself "repealing" or overruling the long-standing precedents which describe the antitrust laws in quite different terms. Nor does the majority overrule the express language of Hallie I precluding the extension of antitrust exemptions to a private party absent the existence of both a statute expressly authorizing anticompetitive conduct and a legislatively stated purpose also clearly supporting such anticompetitive conduct.
¶ 158 For all of the above reasons, I respectfully dissent.
NOTES
[1] Nic J. Eichenseer, Brian Dougherty, and Eric B. Stener filed their complaint in Dane County Circuit Court as parties and representatives of a class of persons who patronize the 24 Madison taverns after 8 p.m. on Friday and/or Saturday nights. Nic J. Eichenseer elected not to appeal the circuit court's decision. Only Dougherty and Stener are participating in this appeal. Accordingly, reference to "the plaintiffs" indicates only Dougherty and Stener.
[2] All references to the Wisconsin Statutes are to the 2003-04 version unless otherwise indicated.
[3] See E.R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).
[4] See Powalka v. State Mut. Life Assurance Co., 53 Wis.2d 513, 518, 192 N.W.2d 852 (1972) (citing Wiegand v. Gissal, 28 Wis.2d 488, 137 N.W.2d 412 (1965), rehearing denied, 28 Wis.2d 488, 495a, 138 N.W.2d 740-b, 28 Wis.2d 488, 138 N.W.2d 740 (1966)); Lucas v. Godfrey, 161 Wis.2d 51, 57, 467 N.W.2d 180 (Ct.App.1991).
[5] Problem drinking, related crimes, and related injuries plague college campuses across the United States. A March 2007 report by The National Center on Addiction and Substance Abuse (CASA) at Columbia University found:

From 1993 to 2005, there has been no significant reduction in the levels of drinking and binge drinking among college students. In 2005, 67.9 percent of students (approximately 5.3 million students) reported drinking in the past month and 40.1 percent (approximately 3.1 million students) reported binge drinking.* However, from 1993 to 2001 rates of riskier drinkingfrequent binge drinking, being intoxicated, drinking to get drunkhave increased.
. . . .
Between 1993 and 2001, there has been a 37.6 percent increase in the proportion of college students hurt or injured as a result of their alcohol use (9.3 percent vs. 12.8 percent). In 2001, 1,717 college students died from unintentional alcohol-related injuriesup six percent from 1998.
. . . .
The average number of alcohol-related arrests per campus increased 21 percent between 2001 and 2005. In 2005, alcohol-related arrests constituted 83 percent of campus arrests.
[FN*: Binge drinking is defined as five or more drinks on any one drinking occasion in the past two weeks.]
The National Center on Addiction and Substance Abuse at Columbia University, Wasting the Best and the Brightest: Substance Abuse at America's Colleges and Universities 3, 4-5 (March 2007), http://www.casacolumbia.org/ absolutenm/articlefiles/380-CollegeIIFinal-Revised.pdf (last visited Apr. 29, 2008).
[6] The "Luther's Blues conditions," requested by the University and imposed by the City, include the following:

 Not to increase the volume contained in a serving without increasing proportionately the price charged for such serving.
 Not to give away any drink or sell at a price that is different from the usual price for the drink for any period of time less than one full week.
 Not to give away any drink or reduce the price of any drink conditioned upon the purchase of any drink or number of drinks.
 Not to sell or give away an unlimited number of drinks during a set period of time for a fixed price.
[7] The record indicates that the following new licensees were subject to the "Luther's Blues conditions": Hawk's, Crave, Dotty Dumpling's, Kimia Lounge, and Nam's Noodles.
[8] The City of Madison, Wisconsin Code of Ordinances provides that an application for a Class B liquor license (which authorizes retail sales of intoxicating liquor for consumption on the premises licensed) must be filed with the City Clerk before it is referred to the Common Council for ultimate approval. Madison, Wis., Code §§ 38.03(2)(b), 38.05(3)(a), 38.05(11) (2007). However, before Council approval, the City Clerk must refer the application to the Alcohol License Review Committee (ALRC), which conducts an "investigation as to the advisability of granting such license" and then makes "a recommendation to the Common Council as to whether or not such application should be granted." Id., § 38.05(3)(a)11.

The City Clerk must also give notice of the application to the Director of the Neighborhood Preservation and Inspection Division, the Chief of the Police Department, the Chief of the Fire Department, and the Director of Public Health, all of whom inspect the premises sought to be licensed and report to the Common Council in writing. Id. The City Clerk must schedule public hearings before the ALRC and Common Council before a Class B license is granted. Id., § 38.05(3)(e).
The ALRC, through its recommendations, clearly influences the Common Council's decision to grant or deny a license. In this case, ALRC Chair Bruer and Alder Verveer, who represented the campus area, influenced the "Luther's Blues conditions" placed upon new and existing licensees in the downtown campus area.
[9] The draft ordinance stated:

38.07(14) Drink Specials Regulated.
Between 8:00 p.m. and closing on any day with regard to the advertising, sale or service of alcohol beverages, licensee shall:
(a) Not increase the volume contained in a serving without increasing proportionately the price charged for such serving.
(b) Not give away any drink or sell at a price that is different from the usual price for the drink for any period of time less than one full week.
(c) Not give away any drink or reduce the price of any drink conditioned upon the purchase of any drink or number of drinks.
(d) Not sell or give away an unlimited number of drinks during a set period of time for a fixed price.
(e) Not advertise in any manner the availability, pricing or dispensing of drinks or alcohol in a manner to lead a reasonably prudent person to conclude that alcohol is available contrary to paragraphs a.-d. above.
[10] These reported statements of ALRC Chair Bruer were cited by the circuit court as "verbal acts" and not regarded for their truth. As such, the statements were considered by the circuit court on the parties' motions for summary judgment.
[11] An ordinance banning smoking in Madison taverns went into effect on May 11, 2004.
[12] The following is an excerpt from this press release:

The Down Town Tavern Working Group (DTWG) is sponsored by the Dane County Tavern League and consists of the majority of taverns and restaurants with alcohol service in the University Avenue/State Street Corridor as well as the local [b]eer wholesalers. The DTWG was formed to provide a proactive and substantive response to the hysteria surrounding student drinking habits, and the regulatory proposals that have been directed at campus area taverns. Following are our proposals for dealing with some of the issues being raised time and time again by the University and City.
Drink Specials:
It is the position of the DTWG that there is no statistically significant correlation between the existence of [d]rink [s]pecials and disorderly behavior. The truly significant drink specials exist on weeknights when disorderly behavior is minimal. . . .
. . . [M]ost of the downtown taverns . . . have voluntarily agreed to eliminate late night drink specials on Friday and Saturday nights beginning September 20, 2002 and continuing for at least the next year. We have our reservations about engaging in what could be considered illegal "collusion in restraint of trade", but we feel this proactive position can cut through the fog and confusion surrounding the role of drink specials and disorderly behavior.
[13] The following taverns were listed in the Tavern League's press release as "Fully confirmed participation as of 9/12/2002": "Amy's Cafe, Angelic, Blue Velvet, Buffalo Wild Wings, Bull Feathers, Brothers, City, Club Amazon, Irish Pub, Kollege Klub, Mad Dogs, Madhatters, Nitty Gritty, Plaza, State Bar, State Street Brats, Stillwaters, Vintage Spirits, Wandos."

Other taverns were listed in the same press release as "Willingness indicated but confirmation not received as of 9/12/2002": "Spices, Paul's Club, Lava Lounge, Red Shed, [The] Pub, Mondays." These six taverns are named as defendants in this suit.
[14] "The eighteenth article of amendment to the Constitution of the United States is hereby repealed." U.S. Const. amend. XXI, § 1.
[15] "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. amend. XXI, § 2.
[16] Wisconsin Stat. § 133.03 reads in part:

Unlawful contracts; conspiracies. (1) Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal. Every person who makes any contract or engages in any combination or conspiracy in restraint of trade or commerce is guilty of a Class H felony, except that, notwithstanding the maximum fine specified in s. 939.50(3)(h), the person may be fined not more than $100,000 if a corporation, or, if any other person, may be fined not more than $50,000.
[17] The court of appeals adopted the label "implied repeal doctrine," which was used by the parties throughout their briefs, to describe the antitrust immunity doctrine of Town of Hallie v. City of Chippewa Falls, 105 Wis.2d 533, 314 N.W.2d 321 (1982) (Hallie I). See Eichenseer v. Madison-Dane County Tavern League, Inc., 2006 WI App 226, ¶ 8, 297 Wis.2d 495, 725 N.W.2d 274. We also adopt this label.
[18] Wisconsin Stat. § 62.11(5), both the 1979-80 and 2005-06 versions, provides:

Powers. Except as elsewhere in the statutes specifically provided, the council shall have the management and control of the city property, finances, highways, navigable waters, and the public service, and shall have power to act for the government and good order of the city, for its commercial benefit, and for the health, safety, and welfare of the public, and may carry out its powers by license, regulation, suppression, borrowing of money, tax levy, appropriation, fine, imprisonment, confiscation, and other necessary or convenient means. The powers hereby conferred shall be in addition to all other grants, and shall be limited only by express language.
[19] Article XI, Section 3 of the Wisconsin Constitution provides in part:

(1) Cities and villages organized pursuant to state law may determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of statewide concern as with uniformity shall affect every city or every village. The method of such determination shall be prescribed by the legislature.
[20] Our analysis of the Hallie I factors will proceed in a different order (i.e., first factor, third factor, second factor) from the order established by the Hallie I court. This reordering is intentional, to emphasize the impact that the second Hallie I factor, "the type of conduct undertaken by a city in a particular instance," has on our ultimate conclusion.
[21] The lengthy quote from Odelberg v. City of Kenosha, 20 Wis.2d 346, 122 N.W.2d 435 (1963), appears at ¶ 15 of the court of appeals decision in this case. Eichenseer, 297 Wis.2d 495, ¶ 15, 725 N.W.2d 274.
[22] A case in point is the Village of Ephraim in Door County. Ephraim is the only municipality in Wisconsin that has chosen to go "dry"alcohol is not allowed to be sold in the Village. A statement from the Village's website proudly proclaims:

We're the only community in all of Wisconsin that is dry. There have been two referendums to ask the citizens if they wanted liquor allowed to be sold within the Villagein 1934 and in 199259% voted no in 1934, 74% voted no in 1992. Ephraim remains dry.
A Brief History of Ephraim, http://www. ephraim-wisconsin.com/ephraim/ephraim+history/default.asp (last visited Apr. 29, 2008).
[23] See Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). As the court of appeals noted, the conceptual underpinnings of the federal "state action" doctrine differ from those of the implied repeal doctrine. Eichenseer, 297 Wis.2d 495, ¶ 19 n. 9, 725 N.W.2d 274.

We have previously stated that Wis. Stat. § 133.01 was intended as a reenactment of the first two sections of the federal Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1 and 2. See Conley Publ'g Group Ltd. v. Journal Commc'ns, Inc., 2003 WI 119, ¶ 18, 265 Wis.2d 128, 665 N.W.2d 879 (citation omitted). The question of what acts constitute a combination or conspiracy in restraint of trade under the Sherman Act is controlled by federal court decisions. Federal decisions construing federal exemptions under the Sherman Act are thus persuasive authority in construing state exemptions under Wisconsin antitrust law.
[24] After the circuit court dismissed the plaintiffs' suit, Alder Mike Verveer commented that if the result had been different, campus taverns would have faced "seven-day-a-week drink-special bans." He added: "This [lawsuit] already affected their livelihoods, and if it had been successful, a lot of `Ma and Pa' operations would have gone out of business." Megan Costello, Judge dismisses drink special suit, The Badger Herald, Apr. 8, 2005, available at http://badgerherald.com/news/2005/04/ 08/judge_dismisses_drin.php (last visited Apr. 29, 2008).
[1] Nobody in this case argues that the City or any municipal actors violated any antitrust law, despite the implication to the contrary created by the majority opinion's primary focus on the applicability of antitrust laws to municipalities.
[2] Another doctrine which the majority incorrectly describes in passing is the Noerr-Pennington doctrine. The majority seems to suggest, without so holding or deciding the issue, that this doctrine might provide another possible source of immunity for the defendants by virtue of their actions being "wholly defensive," despite those actions going beyond mere petitioning the government. See majority op., ¶¶ 90-100. It seems that the majority fails to grasp that the Noerr-Pennington doctrine does not extend beyond petitioning, i.e., allowing individuals to lobby legislators for the passage of anticompetitive legislation. See United Mine Workers of Am. v. Pennington, 381 U.S. 657, 669, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 138, 140, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); Am. Med. Transp. v. Curtis-Universal, Inc., 154 Wis.2d 135, 154-55, 452 N.W.2d 575 (1990) (AMT). The doctrine has never been applied to allow individuals to actually participate in anticompetitive conduct beyond the mere exercise of free speech rights in advocating for legislation; as this court explained in AMT:

The court of appeals correctly stated the applicable law when it said that the "Noerr-Pennington doctrine . . . protects advocacy and not participation."
Airport Car Rental Antitrust Litigation, 521 F.Supp. 568, 584 (N.D.Cal.1981), aff'd 693 F.2d 84 (9th Cir.1982), capsulized the limits of the Noerr-Pennington doctrine when it stated:
Private parties attempting to influence public officials to engage in commercial activities which may later be found to violate the antitrust law do not thereby become themselves liable. For liability to be imposed upon them, they must be participants in the scheme.
Thus, it is clear that, if a scheme or enterprise that has been merely petitioned or lobbied for by private persons is found to violate antitrust laws, liability will not be imposed on those private persons for that conduct alone. See, P. Areeda, H. Hovenkamp, Antitrust Law, para. 201, p. 21 (Supp. 1989).
There have been no cases brought to our attention or which we have discovered in the course of this court's research where a private party who has participated in an anticompetitive scheme is exonerated by Noerr-Pennington. This absence of authority fully accords with the basic premise of Noerr-Pennington  to protect the citizens' right to free speech and to petition government. It goes no further than that.
AMT, 154 Wis.2d at 154-55, 452 N.W.2d 575 (emphasis added). The majority quotes AMT out of context to arrive at a description of Noerr-Pennington which utterly contradicts the above AMT passage. Compare majority op., ¶¶ 93-99 with above quotation from AMT, 154 Wis.2d at 154-55, 452 N.W.2d 575.
[3] See majority op., ¶ 2 ("The defendants contend that their conduct is immune from Wisconsin antitrust law under: (1) the so-called `implied repeal doctrine' articulated in Town of Hallie v. City of Chippewa Falls, 105 Wis.2d 533, 314 N.W.2d 321 (1982) (Hallie I) . . . ").
[4] See, e.g., State v. Black, 188 Wis.2d 639, 645, 526 N.W.2d 132 (1994) (holding that passage of statute imposing restrictions on abortion did not impliedly repeal feticide statute, explaining "[n]othing persuades us that the legislature intended to impliedly repeal sec. 940.04(2)(a) when it enacted sec. 940.15. Implied repeal of statutes by later enactments is not favored in statutory construction."); State v. Zawistowski, 95 Wis.2d 250, 264, 290 N.W.2d 303 (1980)("Implied repeal of statutes by later enactments is not favored in statutory construction. All statutes passed and retained by the legislature should be held valid unless the earlier statute is completely repugnant to the later enactment."); Milwaukee Fed'n of Teachers, Local No. 252 v. WERC, 83 Wis.2d 588, 599, 266 N.W.2d 314 (1978)("`[A]s to changing statutory law, there is a presumption against the implied repeal or amendment of any existing statutory provision.'"); Jicha v. Karns, 39 Wis.2d 676, 680, 159 N.W.2d 691 (1968) (holding that the argument that a later statute superceded an earlier statute "would prevail if the two statutes were in conflict and could not be reconciled. However, repeal or amendment by implication is not favored if they can be reconciled."); Burris v. Karns, 14 Wis.2d 431, 436, 111 N.W.2d 509 (1961) ("[I]n Wisconsin the doctrine of implied repeal is not favored. In Milwaukee County v. Milwaukee Western Fuel Co., 204 Wis. 107, 112, 235 N.W. 545, 547 (1931), we held that `an earlier act will be considered to remain in force unless it is so manifestly inconsistent and repugnant to the later act that they cannot reasonably stand together.'"); State ex rel. Peterson v. County Court of Clark County, 13 Wis.2d 37, 40-41, 108 N.W.2d 146 (1961) ("[I]t is fundamental that implied repeals are not favored and an earlier act will be considered to remain in force if the same may be construed in harmony with the later one. This principle is well established."); Union Cemetery v. City of Milwaukee, 13 Wis.2d 64, 71, 108 N.W.2d 180 (1961) ("Repeals by implication are not favored in the law. The earlier act will be considered to remain in force unless it is so manifestly inconsistent and repugnant to the later act that they cannot reasonably stand together.").
[5] It is worth emphasizing that were Hallie I actually an "implied repeal" case, a completely different legislative intent test would apply. In implied repeal cases, the party seeking to have a statute repealed must show that, in enacting a conflicting statute, the legislature intended to have that statute repealed. Kienbaum v. Haberny, 273 Wis. 413, 420, 78 N.W.2d 888 (1956). Such a hurdle could clearly not be passed in this case, as the majority cites no statute indicating any legislative intent to repeal Wisconsin's antitrust laws in whole or in part.
[6] Wisconsin Stat. § 125.10(1) provides:

Authorization. Any municipality may enact regulations incorporating any part of this chapter and may prescribe additional regulations for the sale of alcohol beverages, not in conflict with this chapter. The municipality may prescribe forfeitures or license suspension or revocation for violations of any such regulations. Regulations providing forfeitures or license suspension or revocation must be adopted by ordinance.
(Emphasis added.)
[7] Although the majority probably intends to describe only the defendants as acting in concert with each other in this passage, elsewhere the majority comes close to describing a similar type of collusion between the defendants and the City for the purpose of equating the defendants' conduct with municipal action. It is worth noting on that point that "[i]n analogous contexts, the Court has held that an exempt entity forfeits antitrust exemption by acting in concert with nonexempt parties." Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 231, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979).
[8] The majority opinion echoes the tone of the defendants' argument that "[t]he only wrinkle presented by this case is the City did not formalize its regulation in the form of an ordinance." In response, Eichenseer issued the following strong rebuke: "Whether or not a regulation is to be found in the written law may be considered a mere `wrinkle' in certain totalitarian nations, but not in the United States." I concur with this statement.
[9] Having explained why the majority's failure to establish the requisite elements of the first prong of the state action test renders the test inapplicable, I will not address the "active state supervision" prong of the test.